532 A.2d 775

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Gershom SESSOMS, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 1, 1986.

Decided Oct. 7, 1987.

Roger B. Reynolds, Norristown, Leonard Sosnov, Philadelphia, for amicus curiae—Defender Assoc. of Phila. & Public Defender Assoc. of Pa.

Mary M. Killinger, Chief, Appeals Div., Norristown, Gaele McLaughlin Barthold, Deputy Dist. Atty., Ronald Eisenberg, Philadelphia, for amicus curiae—Pa. Dist. Atty.'s Assoc.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

ZAPPALA, Justice.

This appeal presents a challenge to the validity of a sentence imposed according to the Sentencing Guidelines, 204 Pa.Code Ch. 303. The appellant Gershom Sessoms was found guilty of aggravated assault and possession of an instrument of crime. He was sentenced to 2½ to 8 years imprisonment on the assault charge and a consecutive term of 5 years probation on the weapons charge. Sessoms unsuccessfully argued to the courts below that the method by which the Sentencing Guidelines were established violated either or both of our Constitution's requirements of bicameral consideration and presentment for gubernatorial approval. We allowed this appeal to address these important questions on which Superior Court was unable to develop a consensus rationale. *See Commonwealth v. Kuphal*, 347 Pa.Super. 572, 500 A.2d 1205 (1985) (companion case).

The Pennsylvania Commission on Sentencing was created in 1978 and given the task, broadly stated, of collecting data regarding sentencing practices throughout the Commonwealth and assimilating a wide range of information and

opinions from individuals and groups interested in the sentencing process either personally, professionally or otherwise. The purpose of this endeavor was to enable the Commission to promulgate guidelines to be considered by courts in imposing sentences and, if appropriate, to propose to the legislature changes in the sentencing statutes.

The Act of November 26, 1978, P.L. 1316, No. 319, originally found at 18 Pa.C.S. § 1381 et seq., (Act 1978–319) created the Commission, set out its powers and duties, and provided the procedure by which guidelines formulated by the Commission were to become effective. It also set out a time frame for the Commission to complete its work, and an "interim guideline" that courts consider sentencing certain repeat offenders to a minimum of four years imprisonment. Along with minor changes to the time elements made by the Act of July 10, 1980, P.L. 518, No. 107, the provisions of Act 1978–319 were transferred to 42 Pa.C.S. § 2151 et seq. by the Act of October 5, 1980, P.L. 693, No. 142, § 218(a) (Act 1980–142).

This enabling legislation contemplates that the Commission will adopt sentencing guidelines after publication in the Pennsylvania Bulletin and opportunity for public comment. It also provides as follows:

(b) *Rejection by the General Assembly* —The General Assembly may by concurrent resolution reject in their entirety any initial or subsequent guidelines adopted by the commission within 90 days of their publication in the Pennsylvania Bulletin pursuant to subsection (a)(2).

(c) *Effective date* —Initial and any subsequent guidelines adopted by the commission shall become effective 180 days after publication in the Pennsylvania Bulletin pursuant to subsection (a)(2) unless rejected in their entirety by the General Assembly by a concurrent resolution within 90 days of their publication. If not rejected by the General Assembly the commissioners shall conduct training and orientation for trial judges prior to the effective date of the guidelines.

42 Pa.C.S. § 2155(b), (c). The appellant challenges the General Assembly's ability to thus retain the power of rejection of the Commission's work-product by concurrent resolution.

In accordance with the enabling legislation, the Commission published proposed guidelines, *see* 10 Pa.Admin.Bull. 4181–96 (Oct. 25, 1980), held public hearings after which revisions were made, adopted the guidelines as revised, and published the adopted guidelines, *see* 11 Pa.Admin.Bull. 463–76 (Jan. 24, 1981). On April 1, 1981, the House passed resolution No. 24, rejecting the guidelines in their entirety and "urg[ing] and direct[ing]" the Commission to "revise and resubmit" them within six months. This resolution, passed by the Senate on April 8, 1981, suggested as areas for review that the Commission increase the upper limits of guideline sentences generally, that judges' authority to account for aggravating or mitigating circumstances be broadened, that the discussion as to concurrent and consecutive sentencing practices be removed, and that crimes involving serious bodily injury be treated more severely. This resolution was not presented to the governor for his review. Thereafter the Commission did adopt a second set of guidelines, "rewritten ... in accordance with the legislative resolution," and published these in the Pennsylvania Bulletin on January 23, 1982, 12 Pa.Admin.Bull. 431–40. The Senate passed a resolution, No. 227, explicitly stating that it "does not reject" these guidelines. These guidelines became effective July 22, 1982, 180 days after their publication.

The appellant's argument is derived from recent decisions of the United States Supreme Court invalidating the "legislative veto" as violative of sections of the federal Constitution instituting the separation of the powers of the several branches of government. In *Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) the Court held unconstitutional a provision of the Immigration and Nationality Act under which either House of Congress could, by resolution, disapprove a

decision of the Attorney General to suspend deportation proceedings. The discretionary power to suspend deportation was granted to the Attorney General by other provisions of the Act. The effect of such disapproval, or veto, was to require deportation of the alien; absence of such a disapproval resolution required cancellation of deportation proceedings.

The court based its holding of unconstitutionality on the federal Constitution's prescription for legislative action by way of bicameral approval, Art. I, § 1, and presentation to the President, Art. I, § 7. Characterizing the Congressional disapproval of the Attorney General's decision as "legislative action", the Court found that it could not be exercised by either House acting alone and without opportunity for Presidential review.

The Court later entered a summary affirmance in *United States Senate v. Federal Trade Commission,* 463 U.S. 1216, 103 S.Ct. 3556, 77 L.Ed.2d 1402, 77 L.Ed.2d 1403, 77 L.Ed.2d 1413 (1983). There the Court of Appeals for the District of Columbia Circuit had invalidated a provision of an Act allowing Congress a two-house veto by concurrent resolution of regulations adopted by the F.T.C. *Consumers Union of U.S., Inc. v. Federal Trade Commission,* 691 F.2d 575 (D.C.Cir.1982). The Circuit Court sitting en banc adopted the rationale of a panel of the same court in *Consumers Energy Council of America v. Federal Energy Regulatory Commission,* 673 F.2d 425 (D.C.Cir.1982), also summarily affirmed by the Supreme Court at 463 U.S. 1216, 103 S.Ct. 3556, 77 L.Ed.2d 1402, 77 L.Ed.2d 1403, 77 L.Ed.2d 1413 (1983). *Consumers Energy v. F.E.R.C.* to a great degree presaged the rationale of *Chadha.*

Recognizing that *Chadha* involved only an interpretation of the federal Constitution, the appellant urges this Court to accept the reasoning articulated there as a sound construction of virtually identical language contained in the Constitution of Pennsylvania.

By Article II, Section 1, our Constitution vests "[t]he legislative power of this Commonwealth ... in a General

Assembly, which shall consist of a Senate and a House of Representatives." Article III, A, sets out the procedure by which laws are to be passed in the exercise of this legislative power. Unlike its federal counterpart, which leaves such matters to the rules of the respective Houses, our Constitution contains explicit strictures among other things preventing substantive changes of purpose in bills on their passage through the Houses, Art. III, § 1; requiring committee consideration of all bills, Art. III, § 2; limiting bills to only one subject clearly identified in the bill's title, Art. III, § 3; and requiring consideration on three different days in each House, Art. III, § 4.

The requirement that bills passed by both Houses be presented to the Governor for approval is contained in Article IV of our Constitution, which sets out the powers of the Executive. (The comparable provision of the federal Constitution is contained in Article I. Although untitled, that Article, with some minor exceptions, deals with the structure and powers of the Congress).

Every bill which shall have passed both Houses shall be presented to the Governor; if he approves he shall sign it, but if he shall not approve he shall return it with his objections to the House in which it shall have originated, which House shall enter the objections at large upon their journal, and proceed to reconsider it. If after such reconsideration, two-thirds of all the members elected to that House shall agree to pass the bill, it shall be sent with the objections to the other House by which likewise it shall be re-considered, and if approved by two-thirds of all the members elected to that House it shall be a law; but in such cases the votes of both Houses shall be determined by yeas and nays, and the names of the members voting for and against the bill shall be entered on the journals of each House, respectively. If any bill shall not be returned by the Governor within ten days after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the General Assembly, by their adjournment, prevent its return, in which

case it shall be a law, unless he shall file the same, with his objections, in the office of the Secretary of the Commonwealth, and give notice thereof by public proclamation within thirty days after such adjournment.

Pa. Const., Article IV, § 15. *Compare*, U.S. Const., Art. I, § 7, cl. 2. A similar presentation requirement, however, regarding orders, resolutions and votes is found in Article III.

Section 9.

Every order, resolution or vote, to which the concurrence of both Houses may be necessary, except on the question of adjournment, shall be presented to the Governor and before it shall take effect be approved by him, or being disapproved, shall be repassed by two-thirds of both Houses according to the rules and limitations prescribed in case of a bill.

*Compare*, U.S. Const., Art. I, § 7, cl. 3.

We shall not replicate the scholarship of the Supreme Court in *Chadha* or the Court of Appeals in *Consumer Energy v. F.E.R.C.*. As were those courts, we are persuaded that the foregoing provisions "are integral parts of the constitutional design for the separation of powers." *Chadha*, 462 U.S. at 946, 103 S.Ct. at 2781. The Supreme Court's summary of the purpose of these sections may equally be applied to the design of our Commonwealth government.

[T]he bicameral requirement and the Presentment Clauses ... serve essential constitutional functions. The [Executive's] participation in the legislative process was to protect the Executive Branch from [the legislature] and to protect the whole people from improvident laws. The division of [the legislature] into two distinctive bodies assures that the legislative power would be exercised only after opportunity for full study and debate in separate settings. The [Executive's] unilateral veto power, in turn, was limited by the power of two-thirds of both Houses ... to overrule a veto thereby precluding final arbitrary action of one person. .... It emerges clearly

that the prescription for legislative action ... represents the Framers' decision that the legislative power ... be exercised in accord with a single, finely wrought and exhaustively considered, procedure.

*Id.* at 951, 103 S.Ct. at 2784.

The Commonwealth argues that various considerations peculiar to the concept of federalism underlay the structure adopted in that Constitution but were lacking in the Pennsylvania experience. It is obvious that the Great Compromise, by which the numerical disadvantage of the smaller states in the House of Representatives was counteracted with equal representation in the Senate, is not precisely duplicated in the General Assembly. It seems equally obvious, however, that the overriding purpose of the bicameral structure—due consideration by separate bodies composed of members representing constituencies of narrower and broader territories—is the same in each. Likewise, although *Chadha* described the President's powers under the Presentment Clauses as "serv[ing] the important purpose of assuring that a *'national'* perspective is grafted on the legislative process," 426 U.S. at 948, 103 S.Ct. at 2782 (emphasis added), we might easily describe the Governor's role under our presentment clauses as adding a statewide perspective to the local and regional perspectives supplied by the House and the Senate respectively. In short, the distinctions argued by the Commonwealth appear insignificant in relation to the similarities of purpose and do not convince us that our Constitutionally ordained separation of powers should be understood to be less exacting than that prescribed in the federal Constitution.

For the most part, the parties have presented the case as a question of whether the foregoing reasoning does or does not apply to Section 2155(c), giving predictably opposite answers to the relevant questions—"Does the *Chadha* rationale apply under the Pennsylvania Constitution?" "If so, does § 2155 run afoul of this rationale?" "If so, is it severable?" We find that this approach, although instructive and certainly more easily applied, avoids a significant

difference between the statutes considered in the federal cases and the sentencing commission's enabling legislation. Absent this difference, § 2155(c) would fail under the *Chadha* reasoning.

The primary distinction we perceive between our Commission on Sentencing and the agencies whose functions the Congress tried to retain a veto power over in the federal cases, is that those agencies were all *administrative* agencies, either independent or within the executive branch. When an agency undertakes the executive function of administering the laws enacted by Congress, which set out policy in varying degrees of detail, it promulgates rules and regulations. Notwithstanding the view that such regulations are adopted under a delegation of the legislative power to the agency, administrative rulemaking may be viewed as entirely executive in nature. *Cf., Consumer Energy v. F.E.R.C.,* 673 F.2d at 473–74. In this view rules may be described as (hopefully) understandable, reasoned, public statements of a method of operation chosen by the executive to ensure fairness in pursuing his responsibility to execute the laws enacted by the legislature.

■ The Supreme Court in *Bowsher v. Synar,* 478 U.S. 714, ——, 106 S.Ct. 3181, 3192, 92 L.Ed.2d 583 (1986) (Comptroller General, as officer of legislative branch, may not be assigned executive functions) stated the essence of this entire line of reasoning, and its relation to *Chadha* as follows: "once [the legislature] makes its choice enacting legislation, its participation ends. [It] can thereafter control *the execution* of its enactment only indirectly—by passing new legislation." (Emphasis added). Thus, to the extent that a statute establishes *governmental* policy, the legislature may not further control the execution of that policy except through legislation. To the extent that a statute establishes only *legislative* structures, the legislature may further control the actions of such structures through means other than legislation, but the powers assigned to those structures may not exceed the legislative and become executive. The primary flaw in the legislation

at issue in *Consumer Energy, Chadha, Bowsher,* et al. was an attempt by the legislative branch, directly or indirectly, to retain some power over the execution of the laws. That characterization may not be so easily applied to the Pennsylvania Commission on Sentencing and its guidelines.

■ A recent amendment to the enabling legislation explicitly establishes the Commission as "an agency of the General Assembly." 42 Pa.C.S. § 2151(a) as amended, Act No. 1986–41, effective May 1, 1986. We accept this designation, adopted long after the commencement of the present litigation raising uncertainty as to the guidelines, as only some evidence, not determinative, of the nature of the Commission. We also find it important that neither the Commission nor any other department of the executive branch has authority to implement the guidelines, accepting for purposes of argument the characterization of the guidelines as "regulations". This function is reserved, indirectly, to the trial courts.

Most significant, however, is the composition of the Commission. The Commission is composed of four judges from the courts of common pleas appointed by the Chief Justice, four members of the General Assembly appointed by the leaders of the respective Houses and representing different political parties, and three appointees of the governor—a district attorney, a defense attorney, and a law professor or criminologist. *Amicus curiae* Defender Association of Philadelphia rightly observes that the inclusion of legislators and/or judges on an agency administering the laws is itself likely violative of the separation of powers doctrine. No clearer concentration of the executive, legislative, and judicial powers in one body can be imagined, *if* that body purports to have authority to carry the laws into effect. While *amicus* makes this point in pursuit of a different line of reasoning, because we are obliged to presume that the General Assembly does not intend to violate the Constitution, 1 Pa.C.S. § 1922(3), we take it as indicating that the Pennsylvania Commission on Sentencing is not an administrative agency, that is, an agency charged with administer-

ing the laws. Accordingly, the *Chadha* rationale does not directly apply to invalidate its enabling legislation.

We find little guidance for understanding the nature and functions of a "legislative agency" in prior cases or statutes, such a creature appearing to be unique. We may presume, however, that just as executive branch agencies exist to carry out functions committed to the executive power, that is, executing or administering the law, a "legislative agency" has as its purpose the furtherance of some aspect of the legislative power. A review of 42 Pa.C.S. § 2153 reveals that the legislative powers that the Commission shares are essentially those of investigation, classification, and evaluation. Such tasks are commonly undertaken by special or standing committees and subcommittees composed entirely of members of the respective Houses of the General Assembly. We find no impediment, however, to the creation of a comparable "legislative agency" that includes others as well, so long as the agency's powers do not exceed constitutional limitations. *Compare, Buckley v. Valeo,* 424 U.S. 1, 137–38, 96 S.Ct. 612, 691, 46 L.Ed.2d 659; *Application of President's Commission on Crime,* 763 F.2d 1191 (11th Cir.1985).

It is readily apparent that the Commission's guidelines cannot, without more, be given the effect of law, either as legislation or regulation, so as to by themselves alter the legal rights and duties of the defendant, the prosecutor, and the sentencing court. Such a result can be obtained only by way of enactment of a law or administration of a law duly enacted. However, to the extent that the rights of the defendant and the prosecution, the duties of the sentencing court, and the relations between them have been altered by the requirement that the court *consider* the guidelines, this has been accomplished by the enabling act—legislative action conforming to constitutional requirements. So long as the judiciary has ultimate control over the application of the guidelines to a particular case, as one factor among the many enumerated in the Sentencing Code as a whole, there has been no substantive change in the judicial prerogative

in sentencing discretion that has not been accomplished by duly enacted legislation. The defendant has no "right" to have other factors take pre-eminence or be exclusive; therefore, to have the guidelines considered, whatever they may provide, does not change his rights. Likewise, the prosecutor has no "right" to have a particular sentence imposed. Most important, the court has no "duty" to impose a sentence considered appropriate by the Commission. The guidelines must only be "considered" and, to ensure that such consideration is more than mere fluff, the court must explain its reasons for departure from them. Viewed in this manner, the guidelines are essentially a sophisticated compilation and distillation of a vast range of factors affecting the sentencing process in the abstract, accomplished by persons of expertise representing a broad spectrum of interests. The legislature with the governor's approval has deemed it proper that the findings of such a body, assembled to assist it in developing and overseeing a sound sentencing system, be given practical application in individual cases as well. We may say that in directing courts to consider these guidelines, just as they must consider a number of listed though non-exclusive factors in imposing probation, the legislature has done no more than direct that the courts take notice of the Commission's work. Only in this limited way can the work-product of the Commission, a legislative agency, be given effect beyond the confines of the General Assembly and at the same time avoid invalidation on constitutional grounds.

We may leave for another day an analysis of the full extent of the powers that may be assigned to a "legislative agency". For present purposes we need examine only the significance of the enabling Act's provision for legislative review of this agency's work-product and disapproval by concurrent resolution. If the *Chadha* rationale may be summarized as holding that nothing less than legislation duly enacted may suffice to override the rulemaking power of an administrative agency, the question raised by this case is whether the same necessarily holds true for a legislative agency. Perhaps unfortunately, as it leaves

little guidance in this new area, our limited function of reviewing the law based on the facts of particular cases requires that we leave this question largely unresolved.

Returning to Act 1978–319 and Act 1980–142, the Commission's enabling legislation, it is clear that if the legislative action necessary to reject[1] the work-product of a legislative agency must take the form of a law, Section 2155(c) is inadequate. However, if there is room in our Constitution for the legislature to exercise its power by means other than passage of a law, and the mere presence of Article III, § 9 suggests that there is, Section 2155(c)'s provision for action by concurrent resolution could be workable. Assuming that the work-product of the legislative agency whose action was being reviewed did not itself exceed constitutional limitations, we do not find that it would clearly, palpably, and plainly violate the Constitution for the General Assembly to override the "policy statements" of its own creature by action not rising to the level of a law. It must be emphasized, however, that except as it relates to the power of each House to determine its own rules of proceedings, under our Constitution the legislative power, even when exercised by concurrent resolution, must be subject to gubernatorial review.

■ We do not find it fatal to the present legislation that it does not explicitly require presentment of a rejection resolution to the governor. We may imply such a condition to avoid finding the statute unconstitutional on its face. In actual application, however, it is clear that the present guidelines are the direct product of a violation of this constitutional requirement of presentment.

1. We do not accept the appellant's argument that an agency's rules, even those of an executive or independent agency, may not take effect by legislative *inaction*. In the federal system this method, called "report and wait" or "laying down", has been approved in *Sibbach v. Wilson & Co.*, 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941). The essence of this method, and the basis for finding it to be within the separation of powers scheme, is that the legislature is merely given the opportunity to "correct" administrative rules before they go into effect *by legislation* duly enacted. Absent such legislation, the rules become effective without change.

Article III, § 9, explicitly directs that "[e]very ... resolution ... to which the concurrence of both Houses may be necessary ... shall be presented to the Governor and before it shall take effect be approved by him...." Under the terms of Section 2155(c), in order to reject guidelines adopted by the Commission, the General Assembly must pass such a resolution to which the concurrence of both Houses is necessary; the conclusion is inescapable that it must thereafter be presented to the Governor and approved by him before it can take effect. Because the rejection resolution here was not presented to the Governor, it should not have taken effect to block the implementation of the guidelines as initially approved by the Commission. Inasmuch as the 1982 guidelines were "rewritten in accordance with the legislative resolution", which should not have taken effect, they are obviously tainted by this error as well. *Cf. Allen v. Carmen*, 578 F.Supp. 951 (D.D.C.1983) (repeated exercise of unconstitutional legislative veto rendered regulations redrafted in compliance invalid.)

The effect of the foregoing for Gershom Sessoms can be identified from the record, although the parties were of no assistance to the Court in identifying it. It appears that under the guidelines initially approved, Sessoms, with no prior record score, would have qualified for a minimum sentence in the range of 8 to 11½ months for the aggravated assault conviction. Under the rewritten guidelines, although the "base" minimum sentence would have been substantially unchanged (8 to 12 months), a new section, applicable to Sessoms was added. Section 303.4(a) provides that "at least 12 months and up to 24 months confinement shall be added to the guideline sentence which would otherwise have been imposed" for possession of a deadly weapon in the commission of a crime. As the trial court indicated that it was following the guidelines, the sentence of 2½ years (30 months) must have been derived from these two provisions; had the rejection resolution not "prevented" the effectiveness of the initial guidelines, a sentence under them would have been 8 to 11½ months.

To summarize, we need not invalidate Section 2155(c) as written so long as the Article III, § 9 presentment requirement is followed with respect to rejection resolutions and the guidelines adopted by the Commission, a legislative agency, do not exceed the constitutional limitations applicable to the legislature generally. We recognize that guidelines adopted under this scheme have significantly less force than is commonly attributed to them, but this result is necessary and unavoidable if the Commission as structured under present legislation is to pass constitutional muster. Because the present guidelines were not adopted according to this scheme, however, but were the product of a rejection resolution that was not presented to the Governor in violation of Article III, § 9, they must be declared to be of no force at all. The appellant's sentence is vacated and his case remanded for resentencing pursuant to the remaining valid provisions of the Sentencing Code.[2]

PAPADAKOS, J., joined in the majority opinion and filed a concurring opinion.

HUTCHINSON, J., filed a concurring and dissenting opinion.

LARSEN, J., filed a dissenting opinion.

PAPADAKOS, Justice, concurring.

I join with the majority because I understand the majority opinion to say that the Sentencing Guidelines were adopted unconstitutionally because of the lack of presentment to the Governor. I also agree with the mandate of remand for resentencing pursuant to the remaining valid provisions of the Sentencing Code. I do not view the Court's decision today as inviting or requiring a review of all sentences heretofore imposed with consideration of the now-found invalid Sentencing Guidelines. These guidelines have been, after all, mere guides to more appropriate sentences and

2. This ruling is applicable to cases where the issue has been "properly preserved at all stages of adjudication up to and including any direct appeal." *Commonwealth v. Cabeza,* 503 Pa. 228, 233, 469 A.2d 146, 148 (1983).

not mandatory locks on judicial discretion. The Sentencing Code, devoid of the Sentencing Guidelines, forms an adequate foundation to support sentences heretofore imposed by the judiciary.

I write separately to express my disquietude with the apparent approbation accorded to the concept of "legislative agency" in the majority opinion. It is commonly understood that the relationships of the three branches of American government with each other are defined by the principles of separation of powers and checks and balances. The broad purposes of these principles include the dispersal of governmental authority to prevent absolutism and the allocation of each function to the branch best suited to perform it. *See,* Bruff, *Presidential Power and Administrative Rule Making,* 88 Yale L.J. 451 (1979). Rigid separation of powers to the extent that effective government becomes impossible is not required:

> The men who met in Philadelphia in the summer of 1787 were practical statesmen, experienced in politics, who viewed the principle of separation of powers as a vital check against tyranny. But they likewise saw that a hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively.

*Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d. 659 (1976).

Modern administrative agencies, on both the state and Federal levels, that have developed since before the New Deal usually combine legislative, executive and judicial functions under one roof. Such agencies are often collectively referred to as the "Fourth Branch" of government. *See,* Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch,* 84 Columbia L.R. 573 (1984). The relationship of the fourth branch to the other three branches is not spelled out in any detail in the Federal Constitution or in our own Pennsylvania Constitution. As Professor Strauss points out about the Federal Constitution:

> The text and structure of the Constitution impose few limits on Congress's ability to structure administrative government. One scanning the Constitution for a sense of the overall structure of the federal government is immediately struck by its silences. Save for some aspects of the legislative process, it says little about how those it names as necessary elements of government-Congress, President, and Supreme Court-will perform their functions, and it says almost nothing at all about the unelected officials who, even in 1789, would necessarily perform the bulk of the government's work.

Strauss, *supra,* at 597.

The same general comments could be made as well about the Pennsylvania Constitution. Nonetheless, because of the inherent concept of separation of powers, and the path of historical development, some bright lines can be established. An administrative agency that carries out public business directly affecting or regulating individual citizens must have some significant official relationship, however tenuous in certain respects, with each of the three constitutional branches. Each of those three branches must have some degree of oversight function in order to pass constitutional muster.

Judicial oversight occurs in the form of judicial review, ranging from limited review to extensive *de novo* review. The Courts, both state and Federal, will determine whether rules and regulations were adopted in a procedurally proper fashion and in conformity with substantive legislative standards. Moreover, courts must determine whether enforcement activities were carried out correctly. As well, courts regularly review quasi-judicial decisions for errors of law or abuse of discretion.

Executive oversight has occurred most frequently in the forms of appointment and removal. In spite of the growth of a professional bureaucracy and civil service protection, it is clear that a President or a governor can hire, or fire, top level policy making administrators. Even with respect to so-called "independent" agencies or commissions, the execu-

tive branch has some input and authority because of the right to appoint, which is usually coupled to a limited right of removal. *See, Humphrey's Executor v. United States,* 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935).

In *Buckley v. Valeo, supra,* the United States Supreme Court held that any "significant governmental duty exercised pursuant to a public law" must be performed by an "Officer of the United States" who is appointed by the President or the head of a department pursuant to Art. II, § 2, cl. 2, 424 U.S. at 140–141, 96 S.Ct. at 692. Recent attempts by the President to exercise oversight authority over federal agency rulemaking and the adoption of specific agency regulations and policies, however, has provoked both widespread comment as well as judicial approval. *See, e.g., Sierra Club v. Costle,* 657 F.2d 298, (D.C.Cir.1981); Bruff, *Legislative Formality, Administrative Rationality,* 63 Texas L.R. 207 (1984); Shane, *Presidential Regulatory Oversight and the Separation of Powers: The Constitutionality of Executive Order No. 12,291,* 23 Arizona L.R. 1235 (1981).

The degree of executive oversight permitted with respect to the Sentencing Commission, at issue here, appears to be perilously close to being non-existent and hence is Constitutionally defective. The governor was permitted to appoint only three of the eleven members of the Sentencing Commission, while the Commission's final guidelines were not subjected to gubernatorial veto or approval. In my judgment, the role of the Executive branch was too limited in relation to the composition and operation of the Sentencing Commission.

If executive branch oversight was too limited here, that defect in and of itself might not be constitutionally fatal. Concurrently, however, legislative oversight has not been confined within proper channels. Article III, § 17, of our state Constitution expressly permits the legislature to appoint legislative officers and employees. Secretarial assistants, support staffs, and investigating personnel certainly may be hired and employed to carry out distinctly legisla-

tive functions. If constituting such a staff or hiring such employees is what is meant by constitutionally creating a "legislative agency," there would be no quarrel with the concept, although such staffs or "agencies" may still operate only with Constitutional limits. See our recent decision in *Lunderstadt v. Pennsylvania House of Representatives*, 513 Pa. 236, 519 A.2d 408 (1986). The Sentencing Commission, however, is not such an entity.

This Court has routinely held, contrary to a more liberal approach often permitted on the Federal level, that legislative power cannot be delegated; that legislation must contain adequate standards to guide and restrain the exercise of delegated administrative functions, including rule making; and that to avoid pure delegation of legislative power by creation of an administrative agency, the Legislature must set limits on such an agency's power and enjoin on it a certain course of procedure and rules of decision in performance of its function. *Chartiers Valley Joint Schools v. County Board of School Directors of Allegheny County*, 418 Pa. 520, 211 A.2d 487 (1965); *Holgate Brothers Co. v. Bashore*, 331 Pa. 255, 200 A. 672, 117 A.L.R. 639 (1938). Here the Sentencing Commission has been impermissibly allowed to make law, subject only to a legislative veto, and with no presentment to the governor.

While such a "legislative agency" might be valid if created by the British Parliament, subject only to supervision by the cabinet or the Prime Minister, such a system is not permitted under American law. Legislative oversight of an administrative agency may take place through the enactment of statutory guidelines and standards, establishment of rules of administrative procedure, use of legislative committees and sub-committees both in the annual appropriation process and for the purpose of considering whether further guidance through legislation may be needed, through constituent casework engaged in by individual legislators who informally investigate constituent grievances, or some combination of all of these. See, generally, Robinson, Gellhorn and Bruff, *The Administrative Process*, 3d.

ed (West Publishing Co., 1986), ch. 2. The so-called "legislative agency" which the Legislature attempted to create here, however, improperly delegates legislative power to an agency, subject only to a legislative veto which is not an appropriate form in which to mold legislative oversight, particularly when oversight by the executive branch is negligible. For these reasons, I believe that it is misleading to suggest the possibility of a "legislative agency" as such.

HUTCHINSON, Justice, concurring and dissenting.

I concur in the majority's analysis distinguishing the provision in Section 244(c)(2) of the federal Immigration and Nationality Act, 66 Stat. 216, *as amended*, 8 U.S.C. § 1254(c)(2), which the United States Supreme Court found unconstitutional in *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), from the statutory scheme by which the Pennsylvania General Assembly created a Sentencing Commission. In the Act of November 26, 1978, P.L. 1316, No. 319, establishing the Pennsylvania Commission on Sentencing,[1] the Pennsylvania General Assembly did not attempt to control the operations of the executive or the judicial branches of government. It simply delegated a portion of its own authority to a legislative agency and required that agency to assist the General Assembly in carrying out its constitutional responsibilities.

Beginning with the creation of a Legislative Reference Bureau in 1909, Act of April 27, 1909, P.L. 208,[2] the legislature has created about ten "legislative agencies," most of which provide technical or informational services to that

1. This Act initially placed the enabling legislation for the Pennsylvania Commission on Sentencing in Subchapter G of Chapter 13 of Title 18 Pa.C.S., known as the Crimes Code. All of the provisions of Chapter 13 were transferred to Title 42 Pa.C.S., the Judicial Code, by the Act of October 5, 1980, P.L. 693, No. 142. *See* 42 Pa.C.S. §§ 2151–2155 and §§ 9701–9781 (1982 and Supp.1986).

2. This Act and subsequent acts on the same subject were repealed by the Act of March 31, 1921, P.L. 81. The latter was, in turn, repealed and replaced by the Act of May 7, 1923, P.L. 158, *as amended*, 46 P.S. §§ 451–465 (Supp.1987).

body in order to enable it to carry out its obligations in enacting legislation and establishing public policy.[3] The Pennsylvania Commission on Sentencing was created in 1978 in order to:

(a) ....

(7) Establish a research and development program within the commission for the purpose of:

(i) Serving as a clearinghouse and information center for the collection, preparation and dissemination of information on Commonwealth sentencing practices.

(ii) Assisting and serving in a consulting capacity to State courts, departments and agencies in the development, maintenance and coordination of sound sentencing practices.

(8) Collect systematically the data obtained from studies, research and the empirical experience of public and private agencies concerning the sentencing processes.

(9) Publish data concerning the sentencing processes.

(10) Collect systematically and disseminate information concerning sentences actually imposed.

**3.** In addition to the Legislative Reference Bureau, the General Assembly has, among other legislative agencies, created: a Local Government Commission, Act of May 29, 1935, P.L. 244, *as amended,* 46 P.S. §§ 431.1–431.7 (Supp.1987); a Joint State Government Commission, Act of July 1, 1937, P.L. 2460, *as amended,* 46 P.S. §§ 65–69 (Supp. 1987); a Legislative Budget and Finance Committee, Act of August 4, 1959, P.L. 587, *as amended,* 46 P.S. §§ 70.1–70.7; a Legislative Data Processing Committee, Act of December 10, 1968, P.L. 1158, 46 P.S. §§ 71.1–71.6; a Joint Legislative Air and Water Pollution Control and Conservation Committee, Act of January 19, 1968, P.L. (1967) 1022, 71 P.S. §§ 1187.1–1187.4 (Supp.1987) and a Legislative Audit Advisory Commission, Act of June 30, 1970, P.L. 442, *as amended,* 71 P.S. §§ 1189.1–1189.2 (Supp.1987). Most of the foregoing are agencies which provide ongoing technical or informational service to the General Assembly. The General Assembly has also created commissions or committees to study particular problems and report their recommendations, *e.g.,* a commission to study public school finances, Act of May 26, 1943, P.L. 635 (since expired); an Anthracite Mine Drainage Study Commission, Act of July 29, 1953, P.L. 996, and April 4, P.L. (1955) 1389, (repealed May 9, 1961, P.L. 186); the Pennsylvania Higher Education Assistance Agency, Act of August 7, 1963, P.L. 549, *as amended,* 24 P.S. §§ 5101–5112 (Supp.1987); the Pennsylvania Crime Commission, Act of October 4, 1978, P.L. 876, *as amended,* 71 P.S. §§ 1190.1–1190.11 (Supp.1987).

(11) Collect systematically and disseminate information regarding effectiveness of sentences imposed.

(12) Make recommendations to the General Assembly concerning modification or enactment of sentencing and correctional statutes which the commission finds to be necessary and advisable to carry out an effective, humane and rational sentencing policy.

(b) Annual reports.—The commission shall report annually to the General Assembly, the Administrative Office of Pennsylvania Courts and the Governor on the activities of the commission.

13 Pa.C.S. § 1382, now found at 42 Pa.C.S. § 2153.[4]

Clearly, these functions could not be fulfilled by the members of the General Assembly in the course of the normal legislative process. The fruits of this broad research were to be recommendations, "Guidelines," as to the appropriate sentences for felonies and misdemeanors, 42 Pa.C.S. § 2154, in keeping with the legislature's historic responsibility for defining criminal offenses and their punishment. The goal of these guidelines was to minimize widely perceived geographical and other disparities in the imposition of sentences under existing statutes. The courts were directed to "consider" these recommendations in determining individual sentences, 42 Pa.C.S. § 2154, but as guidelines they were to serve as a frame of reference, not as controlling directives.

I also concur in the majority's observation that the Constitution of Pennsylvania mandates that:

Every order, resolution or vote, to which the concurrence of both Houses may be necessary, except on the question of adjournment, shall be presented to the Governor and before it shall take effect be approved by him, or being disapproved, shall be repassed by two-thirds of both Houses according to the rules and limitations prescribed in case of a bill.

4. Subsequently amended by the Act of April 30, 1986, P.L. 135, effective May 1, 1986. *See* 42 Pa.C.S. § 2153 (Supp.1986).

Pa. Const., art. III, § 9. I do not, however, agree with those members of the lower court who would require that the procedure for adopting concurrent resolutions must of necessity be reiterated in the legislation itself in order for that requirement to be understood. The language of our Constitution sets forth the underlying assumptions on which all legislative action is posited. Thus the provision in Section 2155 of the Judicial Code:

> The General Assembly may by concurrent resolution reject in their entirety any initial or subsequent guidelines adopted by the commission within 90 days of their publication in the Pennsylvania Bulletin pursuant to subsection (a)(2).

42 Pa.C.S. § 2155(b), by requiring a concurrent resolution, obviously requires the fulfillment of the constitutional procedure for the adoption of concurrent resolutions if such a resolution is to have any legal effect.

I must, however, respectfully dissent from the majority's inferences and conclusions derived from the foregoing premise. A concurrent resolution, other than an adjournment resolution, which has passed both Houses but has not been presented to the Governor, is simply precatory language which lacks the force of law. Such a resolution does not invalidate the first guidelines; *a fortiori*, it does not invalidate the subsequent guidelines which were properly adopted by the Commission and never rejected by either house.

Senate Concurrent Resolution, Serial No. 227, purporting to adopt the 1982 Sentencing Guidelines, was, like its 1981 predecessor on the subject, of no legal consequence. As a concurrent resolution, it would have required House action and gubernatorial approval to take effect. The majority's assumption that the resolution's adoption by the Senate somehow forestalled any rejection of the sentencing guidelines by the House misperceives the independence of two legislative chambers, in which identical or contradictory bills are regularly introduced according to the views of the

individual members and frequently to the chagrin of the legislative leadership.

As a legislative agency, the Commission on Sentencing may have wisely chosen to accept its creator's views and, therefore, developed a new set of guidelines in 1982. There was no enforceable legal requirement that it do so. An ineffective rejection, whether by one or both Houses of the General Assembly, activates the language of Section 2155(c):

Initial and any subsequent *guidelines adopted by the commission shall become effective 180 days after publication in the Pennsylvania Bulletin* pursuant to subsection (a)(2) unless rejected in their entirety by the General Assembly by a concurrent resolution.

42 Pa.C.S. § 2155(c) (emphasis added).

From this legislative history, the majority somehow concludes that a defendant found guilty of aggravated assault and possession of an instrument of crime on March 16, 1983, and sentenced in June of that year, should have been sentenced under guidelines which were effectively superseded on July 22, 1982. The majority and this writer have already concluded that the Sentencing Code is constitutionally sound. *Supra* at 1–2. Thus, whether or not the first set of guidelines would have been enforceable had they been challenged,[5] the second set of guidelines, properly adopted by the Commission in accordance with provisions of the Code, were effective 180 days after their adoption. 42 Pa.C.S. § 2155(c), *supra* at 6.

These latter guidelines have been properly considered by the Montgomery County Court of Common Pleas in imposing a judgment of sentence on June 20, 1983. I would affirm its judgment and that of Superior Court.

5. My research has not revealed any cases before this Court which raised an issue concerning the application of the sentencing guidelines approved by the Commission and published in the Pennsylvania Bulletin on January 24, 1981, 11 Pa.B. 463–76, prior to the effective date, *i.e.,* July 22, 1982, of the second set of guidelines published on January 23, 1982.

390

LARSEN, Justice, dissenting.

I dissent. I would hold that the appellant, Gershom Sessoms, was lawfully sentenced in accordance with the sentencing guidelines adopted by the Pennsylvania Commission on Sentencing (Commission), and which became effective pursuant to the duly enacted provisions of the enabling legislation, 42 Pa.C.S.A. § 2151, et. seq. The enabling legislation establishing the powers and duties of the Commission provides:

The Commission shall adopt guidelines for sentencing within the limits established by law which shall be considered by the sentencing court in determining the appropriate sentence for felonies and misdemeanors committed by a defendant....

Act of 1980, Oct. 5, P.L. 693, No. 142, § 218(a), 42 Pa.C.S.A. § 2154. The legislation further provides, *inter alia*, for: (1) publication of all proposed guidelines, (2) public hearings to receive testimony concerning the proposed guidelines from interested parties, (3) publication of all adopted guidelines, and (4) an opportunity for the General Assembly to reject the guidelines adopted by the Commission. The relevant portion of the enabling act stipulates as follows:

§ 2155. **Publication of guidelines for sentencing**

(a) **General rule.**—The commission shall:

(1) Prior to adoption, publish in the Pennsylvania Bulletin all proposed initial and subsequent sentencing guidelines and hold public hearings not earlier than 30 days and not later than 60 days thereafter ...

\* \* \*

(2) Publish in the Pennsylvania Bulletin all initial and subsequent sentencing guidelines as adopted by the Commission.

\* \* \*

(b) **Rejection by General Assembly.**—The General Assembly may by concurrent resolution reject in their entirety any initial or subsequent guidelines adopted by

the commission within 90 days of their publication in the Pennsylvania Bulletin pursuant to subsection (a)(2).

At the time the Commission's first adopted guidelines were published, pursuant to 42 Pa.C.S.A. § 2155(a)(2), they existed only as potential guidelines subject to the provisions of the enabling legislation. They may have or may not have become effective, depending upon whether the General Assembly exercised its statutory right of rejection. The General Assembly rejected the guidelines.

The majority holds that the concurrent resolution of the General Assembly rejecting the Commission's guidelines must have been presented to the Governor to be valid. In reaching this conclusion, the majority cites Article III, Section 9 of the Pennsylvania Constitution which provides:

Every order, resolution or vote, to which the concurrence of both Houses may be necessary, except on the question of adjournment, shall be presented to the Governor and before it shall take effect be approved by him, or being disapproved, shall be repassed by two-thirds of both Houses according to the rules and limitations prescribed in case of a bill.

The constitutional requirement that orders, resolutions or votes which require the concurrence of both Houses of the Legislature,[1] and every bill which shall have passed both Houses,[2] shall be presented to the Governor applies only to those acts that constitute an "exercise of legislative power" by the General Assembly. I believe that the concurrent resolution rejecting the Commission's guidelines as originally published is not such an exercise. "An 'exercise of legislative power' is an act that is legislative in purpose and effect." *Commonwealth v. Kuphal*, 347 Pa.Super 572, 500 A.2d 1205, (1985) (Opinion by Wickersham, J., upholding the validity of the guidelines under which the appellant was sentenced). The act of the General Assembly in adopting a resolution rejecting the guidelines lacks the requisite legis-

1. Article III, Section 9, Pennsylvania Constitution.
2. Article IV, Section 15, Pennsylvania Constitution.

392

lative purpose or effect. The resolution neither enacts or repeals a law.

After the Commission's adopted guidelines are published, no action on the part of either House of the Legislature is required for the guidelines to become effective. Until the specified statutory period of time goes by without rejection, the published guidelines are nothing more than potential guidelines. A resolution of the General Assembly rejecting the guidelines eliminates their potential to become effective and maintains the continued viability of the then existing sentencing criteria.

The General Assembly exercised legislative power when the enabling legislation was adopted. That legislation was sent on to the Governor, thus satisfying the presentment requirement of the Constitution.[3] Thus, I would hold that the second guidelines adopted pursuant to the enabling legislation, and under which the appellant was sentenced, were duly adopted and are constitutionally valid.

3. Article IV, Section 15, Pennsylvania Constitution.