**[J-62-2020] [MO: Wecht, J.]**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| THE HONORABLE TOM WOLF, GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA, | : : : | No. 104 MM 2020 |
| | : | SUBMITTED: July 1, 2020 |
| Petitioner | : : : : | |
| v. | : : : : | |
| SENATOR JOSEPH B. SCARNATI, III, SENATOR JAKE CORMAN, AND SENATE REPUBLICAN CAUCUS, | : : : : | |
| Respondents | : | |

**CONCURRING AND DISSENTING OPINION**

**JUSTICE DOUGHERTY**                    **DECIDED:  July 1, 2020**

The competing opinions authored by my learned colleagues offer thoughtful, well-intentioned analyses of the issues in this case of palpable and widespread importance. All things considered, however, I respectfully conclude that the majority has the better of the constitutional arguments with regard to the precise Article III, Section 9 claim raised by the Governor — namely, I agree "that a concurrent resolution seeking to force the Governor to end a state of disaster emergency has legal effect and does not fit into any of the three recognized exceptions to presentment[.]"  Majority Op. at 18.  But my alignment with the majority ends there, as I conclude the plain text of Section 7301(c) of the Emergency Management Services Code ("Emergency Code"), 35 Pa.C.S. §§7101-79a31, is unambiguous and reflects the legislature's intent to avoid the constitutional requirement of presentment.  There being only one reasonable interpretation of the

statute, I cannot join the majority's (understandable, even laudable) attempt to save Section 7301(c) from a finding of unconstitutionality by means of invoking the canon of constitutional avoidance. And, I am further compelled to conclude that, once Section 7301(c) is stripped of the legislature's intended safety valve, the severability doctrine instructs that — no matter how severe the consequences may be — the offending portion of the statute is non-severable.

I begin with the text. Section 7301(c) states, in relevant part: "The General Assembly by concurrent resolution may terminate a state of disaster emergency at any time. Thereupon, the Governor shall issue an executive order or proclamation ending the state of disaster emergency." 35 Pa.C.S. §7301(c). To me, this unusual statutory phrasing, with no analog in other statutes of which I am aware, plainly is directed at one thing and one thing only: avoiding presentment. The first sentence of Section 7301(c) quoted above reveals the legislature's unambiguous intent to reserve for itself the ability to terminate, by concurrent resolution, a state of disaster emergency **at any time**. The second sentence, in turn, unambiguously dictates what **shall** follow **thereupon**, *i.e.*, the Governor shall issue an executive order or proclamation ending the emergency. As the majority itself admits, the term "thereupon" is particularly elucidating since, when ascribed its natural and ordinary definition and applied in context, it reasonably can be read to mean "the Governor must issue an executive order as soon as the General Assembly passes the concurrent resolution, without the Governor having an opportunity to approve or veto the resolution first." Majority Op. at 19, *citing* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "Thereupon" as "[i]mmediately; without delay; promptly"). While I certainly agree with the majority that this reading of Section 7301(c) "is a reasonable one[,]" *id.*, I would go further and declare it is the only reasonable one.

The majority obviously disagrees. In its view, the statute is susceptible to multiple interpretations because it "does not state unequivocally that the Governor's declaration of a disaster emergency is terminated the moment that the General Assembly passes a concurrent resolution purporting to do so." *Id.* The majority also finds it relevant that Section 7301(c) mentions the Governor at all, and suggests his involvement in the process envisioned by the legislature "is strong evidence that the General Assembly intended to abide by the Constitution, which also requires gubernatorial involvement." *Id.* at 21. From my point of view, however, these points are easily explained: the legislature wields no executive power in this limited context and has no means to retract the chief executive's previously-issued proclamation, or to issue a new declaration or proclamation undoing the previous one; instead, that power, under the terms of the Emergency Code, resides exclusively with the Governor. *See* 35 Pa.C.S. §7301(b) (explaining "**the Governor** may issue, amend, and rescind executive orders, proclamations and regulations") (emphasis added). As such, the most the legislature conceivably can do is demand a Governor retract such an order himself. That is precisely what this statute aims to do. It instructs that, if the legislature passes a concurrent resolution terminating a declaration of disaster emergency, "thereupon" the Governor shall act. It would have been impossible for the legislature to have written this statute in a way that omits any mention of the Governor whatsoever while simultaneously requiring some physical, executive action on his part.

Not only is the majority's interpretation unreasonable, it effectively rewrites the statute in an attempt to avoid the constitutional quandary altogether. Recall what the statute actually says: "The General Assembly by concurrent resolution may terminate a state of disaster emergency at any time. Thereupon, the Governor shall issue an executive order or proclamation ending the state of disaster emergency." 35 Pa.C.S.

§7301(c). Now consider the alternative reading afforded to the majority's interpretation: "The General Assembly by concurrent resolution may terminate a state of disaster emergency at any time. **[The Governor may then approve or veto the resolution. If the resolution is approved by the Governor or his veto is overridden, t]**hereupon, the Governor shall issue an executive order or proclamation ending the state of disaster emergency." In this way, it is obvious to see that the majority has inserted words (those that are bolded) to avoid any constitutional issue. Worse yet, the majority's insertion of words only make sense some of the time. What if, instead, the Governor fails to approve the resolution **and** the legislature fails to override his veto? In that not unlikely scenario, the entire second sentence of the statute becomes meaningless; even if the legislature passes a concurrent resolution, nothing "shall" happen "thereupon." That cannot possibly be what the legislature intended. *See, e.g.*, 1 Pa.C.S. §1922(1) (presumption that the legislature "does not intend a result that is absurd, impossible of execution or unreasonable"). But of course, such an absurd interpretation should never come to pass, because the statute is facially unambiguous and, in any event, our rules of statutory construction preclude us from inserting words into the statute or rendering existing words superfluous. *See, e.g.*, 1 Pa.C.S. §1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."); 1 Pa.C.S. §1922(2) (in ascertaining legislative intent, there is a presumption "[t]hat the General Assembly intends the entire statute to be effective and certain").

For much the same reason, given the explicit statutory language quoted above I respectfully disagree that this case may be resolved by reading the presentment requirement into the statute in accordance with our prior decision in *Commonwealth v. Sessoms*, 532 A.2d 775 (Pa. 1987). As the majority recites, in *Sessoms* "'we d[id] not find it fatal to'" the legislation at issue "'that it d[id] not explicitly require presentment of a

rejection resolution to the [G]overnor'" since we determined we could "'imply such a condition to avoid finding the statute unconstitutional on its face.'" Majority Op. at 24, *quoting Sessoms*, 532 A.2d at 782. But the same is not possible here because the statute **explicitly** dictates a contrary procedure, a situation we did not face in *Sessoms*. It's one thing to read an implied constitutional requirement into an otherwise silent statutory provision to save the statute from falling; it's quite another to strike an express provision out of a statute to make room for a contradictory implication that satisfies the constitutional command, or to ignore the express and unambiguous terms of the statute altogether. *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, ___ U.S. ___, 2020 WL 3492641, at *18 (June 29, 2020) ("Constitutional avoidance is not a license to rewrite [the legislature]'s work to say whatever the Constitution needs it to say in a given situation.").

In sum, I believe that Section 7301(c) is susceptible to only one reasonable interpretation — the one described by the plain terms of the statute itself. That plain language is clear, and leaves no room for the Governor to take any other action than that which is statutorily prescribed. Accordingly, while I have no doubt that it would be a far cleaner task to simply declare the statute ambiguous and apply the canon of constitutional avoidance to resolve this matter, that path is, unfortunately, unavailable to us. *See, e.g.*, *Robinson Twp. v. Commonwealth*, 147 A.3d 536, 574 (Pa. 2016) ("Although courts should interpret statutes so as to avoid constitutional questions when possible, they cannot ignore the plain meaning of a statute to do so.") (citations omitted). That being the case, and since the statutory mechanism crafted by the legislature is clearly at odds with Article III, Section 9 of the Pennsylvania Constitution, it must be stricken as unconstitutional.

But this does not end the matter either. Section 1925 of the Statutory Construction Act provides that whenever any provision of any statute is held invalid, we must shift our consideration to "whether the statute can survive without those invalid provisions, with

principal focus on the legislature's intent." *Commonwealth v. Hopkins*, 117 A.3d 247, 259 (Pa. 2015), *citing, e.g.*, 1 Pa.C.S. §1925. The legislature did not expressly state whether relevant portions of the subject statute are non-severable, but this of course is not dispositive. *See Stilp v. Commonwealth*, 905 A.2d 918, 972 (Pa. 2006) (explaining we have "not treated legislative declarations that a statute is severable, or nonseverable, as 'inexorable commands,' but rather have viewed such statements as providing a rule of construction"). By its terms, moreover, Section 1925 creates a general presumption of severability for every statute, **unless** a court concludes that: (1) "the valid provisions of the statute are so essentially and inseparably connected with, and so depend upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one;" or (2) "the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent." 1 Pa.C.S. §1925. No one here seriously disputes that this latter exception is not in issue, and the reason for this is straightforward: the Governor clearly can execute the other provisions of the statute after the language relating to the legislature's designed oversight mechanism is severed. Thus, the only arguable impediment to severing the portion of the statute that runs afoul of Article III, Section 9, lies within the first exception to the presumption of severability. I therefore turn to that exception and the principles that guide our review.

As noted, "[i]n determining the severability of a statute . . ., the legislative intent is of primary significance." *Saulsbury v. Bethlehem Steel Co.*, 196 A.2d 665, 667 (Pa. 1964). We have previously explained "[t]he 'touchstone' for determining legislative intent in this regard is to answer the question of whether, after severing the unconstitutional provisions of a statute, 'the legislature [would] have preferred what is left of its statute to no statute at all.'" *Nextel Commc'ns of Mid-Atl., Inc. v. Commonwealth*, 171 A.3d 682,

703 (Pa. 2017), *quoting D.P. v. G.J.P*, 146 A.3d 204, 216 (Pa. 2016). We must also presume that the legislature carefully chose to include every provision of every statute it enacts. *See* 1 Pa.C.S. §1921(a) ("Every statute shall be construed, if possible, to give effect to all its provisions."). Applying these principles, I am constrained to conclude that, absent the so-called legislative veto provision, we may not presume the legislature would have enacted the statute — at least not in its current form.

To be sure, the comprehensive authority that the General Assembly granted the Governor to respond to an emergency is far more extensive and elaborately developed than the legislative-veto provision. But this comparative brevity says nothing about the provision's potency. On this front, I share Chief Justice Saylor's view that it seems "quite unlikely that the Legislature would have conferred such a broad delegation of emergency powers upon the Governor while apprehending that the contemplated legislative oversight was subordinate to a gubernatorial veto, thus affording the executive the ability to require a supermajority vote." *Id.* at 7. Significant proofs support this position.

First, the bare fact that the legislature opted to include the language at all demonstrates that it must carry some significance. *See, e.g.*, 1 Pa.C.S. §1921(a); 1 Pa.C.S. §1922(2). Indeed, as we recently remarked (whether it be *dicta* or not), the purpose of the legislature's intended oversight mechanism is manifest: it serves "[a]s a counterbalance" to the broad powers granted to the Governor under the Emergency Code. *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 886 (Pa. 2020). And we are not alone in our view that the legislature's mechanism was intended to serve as a vital check on the otherwise far-reaching powers conferred under the Emergency Code, which give

the Governor "the authority to declare one of the longest emergency declarations of any governor in the United States." *Id.* at 885 n.9 (citation omitted).[1]

In fact, the National Governors Association "characterizes the ability of a legislature to intervene to terminate a declaration of a state of emergency as a 'limitation on emergency powers[.]'" Patricia Sweeney, JD, MPH, RN, Ryan Joyce, JD, *Gubernatorial Emergency Management Powers: Testing the Limits in Pennsylvania*, 6 PITT. J. ENVTL PUB. HEALTH L. 149, 177 (2012), *quoting* National Governors Association Center for Best Practices, The Governor's Guide to Homeland Security at 14 (2007), http://www.nga.org/files/live/sites/NGA/files/pdf/0703GOVGUIDEHS.PDF.  If the judicial and executive branches view the legislative-veto provision as an intentional means of curtailing the powers granted under the Emergency Code, then surely the legislature, the author of the statute, must ascribe at least as much significance to it — and likely far more.  *Accord* Reply Brief for Respondents at 15 ("[C]ommon sense and experience dictate that each branch of government seeks to protect its institutional powers to the greatest degree practicable.").

If more support for the conclusion that the legislature might prefer no statute over a stripped-down version were required, one need not look far.  Turning back to the

---

[1] There are various legislative efforts underway that seek to reduce the length of such declarations. *See, e.g.*, H.B. 2428, 204th Gen. Assemb., Reg. Sess. (Pa. 2020) (referred to Committee on State Government, Apr. 24, 2020) (proposing reduction to 45 days); S.B. 1174, 204th Gen. Assemb., Reg. Sess. (Pa. 2020) (referred to Veterans Affairs and Emergency Preparedness, June 5, 2020) (proposing reduction to 30 days); S.B. 1160, 204th Gen. Assemb., Reg. Sess. (Pa. 2020) (referred to Veterans Affairs and Emergency Preparedness, June 5, 2020) (proposing reduction to 10 days).  Of course, the issue of presentment will likely prove to be a hurdle in any of these efforts.  As one of the many *amicus* parties in this matter rhetorically observes, "a lower threshold . . . would be required for the impeachment of a Governor" than it would take to override a veto of H.R. 836 or any other legislation seeking to alter the Emergency Code.  Brief of *Amicus Curiae*, the Commonwealth Foundation for Public Policy Alternatives, in Support of Respondents, at 20 (emphasis omitted).  *Amicus* has exaggerated for dramatic effect, perhaps, but the point is well taken.

statutory language, I emphasize once more that it explicitly states the "General Assembly by concurrent resolution may terminate a state of disaster emergency **at any time**." 35 P.S.C. §7301(c) (emphasis added). It continues, "[t]**hereupon,** the Governor **shall** issue an executive order or proclamation ending the state of disaster emergency." *Id.* (emphasis added). Again, the only reasonable meaning that can be attributed to this language — the bolded passages in particular — is that it shows the General Assembly's unambiguous intention that it be able to end the declaration without presentment.

To recognize the legislature's intent in this regard is to effectively answer the question of severability: because the legislature operated under the assumption it could end a state of disaster emergency without presentment, and the majority of this Court now reaches the opposite conclusion, "it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one[.]" 1 Pa.C.S. §1925. Any notion that the device the legislature crafted to avoid presentment should be construed as some unimportant add-on, would be untenable. As I see it, not only does the relevant statutory language constitute a "prominent and central feature[ ] of the statute[,]" *Hopkins*, 117 A.3d at 259, it represents the legislature's unambiguous attempt to impose a critical (albeit unconstitutional) counterbalance to the Governor's sweeping exercise of delegated emergency powers.

As well, I note that in other cases that do not call into question the interplay between branches of our Commonwealth government, we have not hesitated to strike down statutes with non-severable, unconstitutional provisions even where "constitutional requirements can be said to have been satisfied in the abstract." *Commonwealth v. Wolfe*, 140 A.3d 651, 662 (Pa. 2016). From my perspective, any effort to re-write the statute or ignore its plain language is merely a means to the same end — *i.e.*, permitting the constitutional requirement of presentment to be satisfied notwithstanding the fact that

the statute explicitly aims to avoid exactly that.  Respectfully, the unusual and urgent circumstances this case supplies do not permit us to abandon our duty to apply the severability doctrine in a consistent fashion, or to disregard the relevant interpretive principles.  *See, e.g.*, 1 Pa.C.S. §1921(a), (b); *Commonwealth v. Kirkner*, 805 A.2d 514, 516-17 (Pa. 2002) ("[A] statute cannot be modified by judicial discretion, no matter how well-intentioned.") (citations omitted).

In summary and to reiterate, I would hold Section 7301(c) of the Emergency Code violates the Pennsylvania Constitution and the offending portion of the statute may not be severed.  For the reasons outlined above, "it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one[.]"  1 Pa.C.S. §1925.  The presumption of severability having been rebutted, in my view, we are left with no choice but to declare the statute unsalvageable.[2]

---

[2] I recognize a finding of non-severability is strong medicine in the present matter, which involves governmental power to confront a pandemic emergency.  Although it has played no role in my consideration of the purely legal issues involved, I observe that in *Friends of Danny DeVito* we noted the Governor has actually invoked **three statutory grounds** for his administration's authority to address the present pandemic:  "the [Emergency Code]; [S]ections 532(a) and 1404(a) of the Administrative Code, 71 P.S. §532; 71 P.S. § 1403(a); and the Disease Prevention and Control Act (the "Disease Act"), 35 P.S. §521.1-521.25."  227 A.3d at 880.

There is no challenge presently before us to any source of authority other than the Emergency Code, and as far as I am aware, the various powers conferred by those statutes are not tied to the fate of Section 7301(c).  *See, e.g.*, 71 P.S. §532(a), (c) ("The Department of Health shall have the power, and its duty shall be . . . [t]o protect the health of the people of this Commonwealth, and to determine and employ the most efficient and practical means for the prevention and suppression of disease; . . . and to enforce quarantine regulations[.]"); 71 P.S. §1403(a) ("It shall be the duty of the Department of Health to protect the health of the people of the State, and to determine and employ the most efficient and practical means for the prevention and suppression of disease."); 35 P.S. §§521.1-521.25 (pertaining to quarantine and other control measures in response to communicable diseases).