MCT TRANSPORTATION INC. t/a Montco Suburban Taxi and Bucks County Services, Inc. and Concord Coach Limo t/a Concord Coach Taxi and Concord Coach USA t/a Bennett Taxi and Dee–Dee Cab Company t/a Penn Dell Cab and Germantown Cab Company, Petitioners

v.

PHILADELPHIA PARKING AUTHORITY, Respondent.

Commonwealth Court of Pennsylvania.

Argued Oct. 17, 2012.

Decided Feb. 14, 2013.

Henry M. Sheridan, Philadelphia, for petitioners.

Alan C. Kohler, Harrisburg, for respondent.

BEFORE: PELLEGRINI, President Judge, and McGINLEY, Judge, and LEADBETTER, Judge, and COHN JUBELIRER, Judge, and LEAVITT, Judge, and BROBSON, Judge, and COVEY, Judge.

OPINION BY Judge LEAVITT.

MCT Transportation, Inc. t/a Montco Suburban Taxi, Bucks County Services, Inc., Concord Coach Limo t/a Concord Coach Taxi, Concord Coach USA t/a Bennett Taxi, Dee–Dee Cab Company t/a Perm Dell Cab, and Germantown Cab Company (collectively, the Taxicab Companies) have filed a petition for review in this Court seeking declaratory and injunctive relief. Their petition lodges a facial constitutional challenge to Section 5707(b) of the act commonly referred to as the Parking Authority Law,[1] by which the Philadelphia Parking Authority sets its annual budget and fee schedule. The Taxicab Companies charge that Section 5707(b) is unconstitutional because it did not impose any limitations on the Parking Authority's exercise of discretion in these activities. The Taxicab Companies also charge that Section 5707(b) effects a taking without due process of law because it deprives them of the opportunity for a hearing on

1. 53 Pa.C.S. §§ 5501–5517, 5701–5745.

the amount of licensing fees they must pay to the Philadelphia Parking Authority in order to stay in business; they claim these fees are excessive and confiscatory. The Parking Authority has moved to dismiss the petition for review on these claims, and the Taxicab Companies have moved for summary relief. For the reasons that follow, we grant summary relief to the Taxicab Companies, in part.

**Background**

The Taxicab Companies hold certificates of public convenience issued by the Pennsylvania Public Utility Commission that authorize them to provide call or demand service in certain designated areas of Philadelphia and its suburbs.[2] Petition for Review ¶ 1. Prior to 2004, the Commission was solely responsible for the regulation of taxicab and limousine operations throughout Pennsylvania. In 2004, the General Assembly transferred part of this regulatory responsibility to the Parking Authority, i.e., the regulation of taxicab and limousine service in Philadelphia. See Act of July 16, 2004, P.L. 758, No. 94 (Act 94). This new regulatory regime for the City of Philadelphia is set forth in Chapter 57 of the Parking Authority Law, 53 Pa.C.S. §§ 5701–5745.

Chapter 57 provided the Parking Authority with the funding needed to undertake its new regulatory responsibilities. Section 5708 of the Parking Authority Law established the "Philadelphia Taxicab and Limousine Regulatory Fund," which derives its revenue from the fees paid by the various taxicab and limousine companies regulated by the Parking Authority. 53 Pa.C.S. § 5708(a). The fees paid by these companies change from year to year; the Parking Authority publishes its annual fee schedule on its website and in the *Pennsylvania Bulletin.* 52 Pa.Code § 1001.43(b).[3]

In turn, Section 5707(b) of the Parking Authority Law established the process for establishing the Parking Authority's annual budget and fee schedule. It states as follows:

(b) Fiscal year budget and fees.—The fiscal year for the fund shall commence on July 1 of each year. Before March 15 of each year, *the authority shall submit a budget and proposed fee schedule,* necessary to advance the purposes of this chapter, for the coming fiscal year along with comprehensive financial data from the past fiscal year *to the Appropriations Committee of the Senate and the Appropriations Committee of the House of Representatives.* Unless either the Senate or the House of Representatives acts to disapprove through adoption of a resolution by April 15 of each year, the authority fee schedule shall become effective. *The authority shall notify all certificate holders of the fee schedule for the coming fiscal year.* The procedure for notifying certificate holders must be specified in the regulations of the authority. *If either the Senate or the House of*

---

**2.** Because this controversy presents a facial constitutional challenge, the petition for review contains few facts.

**3.** It states:

(b) The Authority will provide general notice of the new fee schedule through publication in the *Pennsylvania Bulletin.* The Authority will provide direct notice of the fee schedule by email to each certificate holder as required under section 5707(b) of the act within 5 days of its effective date. The current fee schedule may be obtained from the Authority's web site at *www.philapark.org/tld.*
52 Pa.Code § 1001.43(b).

*Representatives acts to disapprove the authority's fee schedule and budget, the authority may submit a revised budget and fee schedule to the Appropriations Committee of the Senate and the Appropriations Committee of the House of Representatives within 15 days of such disapproval or shall utilize the fee schedule and budget for the prior year. Unless either the Senate or the House of Representatives acts to disapprove, through adoption of a resolution within ten legislative days from the date of submission of the revised budget and fee schedule, the revised budget and fee schedule of the authority shall become effective.*

53 Pa.C.S. § 5707(b) (emphasis added).

To recap, by March 15th of each year, the Parking Authority submits "a budget and proposed fee schedule" for the coming fiscal year "along with comprehensive financial data from the past fiscal year" to the Appropriations Committees of the Senate and the House of Representatives. 53 Pa.C.S. § 5707(b). If neither committee takes action within 30 days to move a disapproval resolution through its respective chamber, the Parking Authority's budget and fee schedule "become effective." *Id.* In the event of a disapproval resolution, the Parking Authority has 15 days to submit a revised budget and fee schedule to the Appropriations Committees. If neither committee acts within 10 days, the revised budget and fee schedule become effective. *Id.*

On March 9, 2012, the Parking Authority's Board [4] approved an annual budget and fee schedule for fiscal year 2013 and submitted them to the Appropriations Committees. Petition for Review ¶ 35. Because neither committee took action to disapprove the proposed budget and fee schedule, they became effective on April 15, 2012.

Consistent therewith, the Parking Authority invoiced the Taxicab Companies for the 2013 fees. Petition for Review ¶¶ 37–38. When the Taxicab Companies did not pay the invoiced fees by June 15, 2012, the Parking Authority issued citations to them. Petition for Review ¶ 39. The Taxicab Companies are, or shortly will be, subject to sanctions by the Parking Authority including "impoundment of their vehicles, imposition of fines, penalties, and late fees and suspension, revocation, or cancellation of their certificates of public convenience." Petition for Review ¶ 41.

The Taxicab Companies responded by filing the instant petition for review.[5] The Taxicab Companies contend that the Parking Authority lacks the statutory power to regulate them, let alone charge them a licensing fee. Petition for Review ¶ 42(a). They also contend that the fee schedule is arbitrary and confiscatory because the Taxicab Companies, which operate in a small area of Philadelphia, are charged a

---

**4.** Section 5508.1(b) of the Parking Authority Law states that in cities of the first class, *i.e.,* Philadelphia, "the powers of [the Parking Authority] shall be exercised by a board[.]" 53 Pa.C.S. § 5508.1(b).

**5.** In April 2012, the Taxicab Companies filed a petition for review in this Court's appellate jurisdiction seeking to challenge the Parking Authority's March 9, 2012, approval of the proposed budget and fee schedule, which the Taxicab Companies asserted was an "adjudi-

cation." The Parking Authority responded with a motion to quash. Concluding that the Parking Authority's action was not an adjudication, this Court granted the motion to quash without prejudice to the Taxicab Companies' ability to bring an original jurisdiction action challenging the Parking Authority's fee schedule. *MCT Transportation, Inc. t/a Montco Suburban Taxi v. Philadelphia Parking Authority,* (Pa.Cmwlth., No. 594 C.D. 2012, filed July 10, 2012) (single judge opinion).

higher fee ($1,500 per vehicle) than medallion taxicabs that have citywide call and demand rights ($1,275 per vehicle). Petition for Review ¶ 42(b). The Taxicab Companies contend that the Parking Authority has improperly imposed higher fees on them to favor medallion taxicabs and to recoup from the Taxicab Companies the Parking Authority's past expenses of litigation with the Taxicab Companies. Petition for Review ¶ 42(c), (d). The Taxicab Companies allege that the "per vehicle" fee is unlawful because it bears no rational relationship to the revenue or profitability of individual taxicab operators; imposes fees that are excessive; and imposes *de facto* limitations on their certificates of public convenience by making it economically impossible to put additional vehicles into service as public need dictates. Petition for Review ¶ 42(e), (f). Finally, the Taxicab Companies allege that Section 5707 improperly subjects them to double taxation because they also pay an annual licensing fee to the Commission. In fact, the Parking Authority's fees are nearly ten times the amount paid to the Commission for the regulation of their activities in a much larger territory than their small Philadelphia service area. Thus, the Parking Authority's fees are confiscatory. Petition for Review ¶ 42(g),(h).

The Taxicab Companies seek a declaration that Section 5707(b) is unconstitutional. They contend that the General Assembly has delegated its legislative power to the Parking Authority because it has given no "guidance, standards for, or restrictions on" the Parking Authority's power to formulate an annual budget or fee schedule.

Petition for Review ¶ 26. The Taxicab Companies also seek a declaration that Section 5707(b), which does not provide them a hearing by which to challenge the Parking Authority's fee schedule, effects a taking without due process of law. Petition for Review ¶¶ 27–28. Finally, the Taxicab Companies seek a declaration that Act 94 is void and unenforceable in its entirety because Section 5707(b) is not severable from the remainder of Act 94. This is because it cannot be presumed that the General Assembly would have enacted the remainder of Act 94 without the funding mechanism in Section 5707(b). Petition for Review ¶¶ 50–55.

The Taxicab Companies request an order enjoining the Parking Authority from taking any action under authority of Section 5707(b) "including the imposition, collection, or enforcement of past, present and future fee schedules" and from implementing, administering or enforcing all other provisions of Act 94. Petition for Review ¶ 57. Believing that their right to this requested relief is clear, the Taxicab Companies have filed a motion for summary relief.[6]

The Parking Authority filed preliminary objections in the nature of a demurrer asserting that the Taxicab Companies have failed to state a claim because its 2012–2013 budget and fee schedule was set by the legislature, not by adjudication of the Parking Authority. Accordingly, there is no right to a hearing. The Taxicab Companies need to lobby the Appropriations Committees between March 15 and April 15 if they seek another outcome. The Parking Authority asserts that the Taxicab

**6.** The Taxicab Companies filed their motion for summary relief under Rule 1532(b) of the Pennsylvania Rules of Appellate Procedure, which states:

(b) Summary relief. At any time after the filing of a petition for review in an appel-

late or original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear.

PA. R.A.P. 1532(b).

Companies lack standing because they claim not to be subject to any regulation by the Parking Authority and, if that is so, then the Parking Authority's fee schedule or budget is irrelevant to them. Finally, the Parking Authority asserts that the Taxicab Companies have failed to name the General Assembly and the Attorney General as respondents, and they are indispensable parties to an action challenging the constitutionality of Section 5707 of the Parking Authority Law.[7]

## Unconstitutional Delegation of Legislative Power

■ Legislative enactments enjoy a strong presumption that they do not violate the Constitution. *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth,* 583 Pa. 275, 877 A.2d 383 (2005). A party challenging a statute's constitutionality "bears 'a very heavy burden of persuasion' to overcome this presumption." *Id.* at 292, 877 A.2d at 393. Therefore, "a statute will not be declared unconstitutional unless it *clearly, palpably,* and *plainly* violates the Constitution." *Id.* (emphasis in original).

■ Article II, Section 1 of the Pennsylvania Constitution vests legislative power in a General Assembly.[8] Legislative power is the power to make a law and, thus, the General Assembly "cannot constitutionally delegate the power to make law to any . . . other body or authority." *Blackwell v. State Ethics Commission,* 523 Pa. 347, 359–60, 567 A.2d 630, 636 (1989). However, it can "make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend." *Bell Telephone Co. of Pennsylvania v. Driscoll,* 343 Pa. 109, 114, 21 A.2d 912, 914 (1941) (quoting *Locke's Appeal,* 72 Pa. 491, 498 (1873)). The legislature must make the basic policy choices, but it can "impose upon others the duty to carry out the declared legislative policy in accordance with the general provisions" of the statute. *Chartiers Valley Joint Schools v. County Board of School Directors of Allegheny County,* 418 Pa. 520, 529, 211 A.2d 487, 492 (1965) (quoting *Belovsky v. Redevelopment Authority,* 357 Pa. 329, 342, 54 A.2d 277, 284 (1947)). In that situation, "it is the legislature which has legislated and not the administrative body." *Bell Telephone,* 343 Pa. at 114, 21 A.2d at 915.

■ When conferring power on an agency to decide the facts and apply the

---

7. We dismiss this claim at the outset. Members of the General Assembly may participate or be named defendants in a constitutional challenge to a statute, but they are not necessary parties. *See, e.g., Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth,* 583 Pa. 275, 877 A.2d 383 (2005) (naming as defendants, *inter alia,* Robert C. Jubelirer, President Pro Tempore of the Senate, John M. Perzel, Speaker of the House, Robert J. Mellow, Minority Leader of the Senate and H. William DeWeese, Minority Leader of the House). The Pennsylvania Attorney General must be given notice of a constitutional challenge to a statute. *See* Pa. R.C.P. No. 235. Under Section 204(a)(3) of the Commonwealth Attorneys Act, Act of October 15, 1980, P.L. 950, the Attorney General has the duty "to uphold and defend the constitutionality of all statutes. . . ." 71 P.S. § 732–204(a)(3). However, the Attorney General may authorize agency counsel to "defend any particular litigation" where he concludes it would be "more efficient." Section 204(c) of the Commonwealth Attorneys Act, 71 P.S. § 732–204(c). In this case, the Attorney General was served with the Taxicab Companies' petition for review and chose not to represent the Commonwealth in a defense of the Parking Authority Law.

8. It states as follows:

The legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives.

PA. CONST. art. II, § 1.

law to a particular situation, the legislature must establish the standards for exercising that power. *Id.* at 115–16, 21 A.2d at 915–16. *Bell Telephone* involved a statute that required the Public Utility Commission to approve every contract between a public utility and an "affiliated interest" as a condition precedent to the contract's validity. A public utility's failure to obtain this approval would have resulted in a fine of $5,000 and five years' imprisonment. Bell Telephone challenged the statute as unconstitutional because it did not provide any standards by which the Commission was to conduct its review and grant its approval, or disapproval, of a contract. The Commission responded, somewhat obliquely, that the statute was constitutional because it contained the "implicit" standard of "public interest."

The Supreme Court rejected this argument, concluding that even if "public interest" could be read into the statute, it was no standard at all. Rather, it is the legislature's responsibility to determine what constitutes the "public interest." The Supreme Court reasoned as follows:

> Before any commission can decide whether a contract is contrary to public interest, it is necessary to find out what is or what is not in the public interest. The power to make such determination rests with the legislature and without such declaration the commission would be without a standard or criterion.

*Id.* at 116, 21 A.2d at 915. Accordingly, the legislature

> *must surround such authority with definite standards, policies and limitations* to which such administrative officers, boards or commissions, must strictly adhere and by which they are strictly governed. If the legislature fails, however, to prescribe with reasonable clarity the

limits of the power delegated or if those limits are too broad its attempt to delegate is a nullity.

*Id.* at 116, 21 A.2d at 915–16 (citing *Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935)) (emphasis added). Because the statute lacked standards by which the Commission was to exercise its discretion in approving or disapproving a contract between a public utility and its "affiliated interest," it was declared unconstitutional.

This Court recently considered the issue of an unconstitutional delegation of legislative authority in *Association of Settlement Companies v. Department of Banking*, 977 A.2d 1257 (Pa.Cmwlth.2009) (en banc). At issue was the Debt Management Services Act,[9] which charged the Department of Banking with the responsibility to regulate the conduct of debt settlement service providers, including the fees they could charge customers for their services. Section 3(b) of the Debt Management Services Act stated, in relevant part, that:

> No person may … provide debt settlement services to a consumer for a fee unless the person is licensed by the department under this act and is operating in accordance with *regulations promulgated by the department regarding the conduct of debt settlement services.*

63 P.S. § 2403(b) (emphasis added). Debt settlement service providers challenged Section 3(b) as facially unconstitutional because it contained no standards to guide the Department's licensing and regulation. The Department moved to dismiss the complaint, and this Court overruled the Department's preliminary objections.

Relying on *Bell Telephone*, we concluded that the Debt Management Services Act lacked "sufficient standards to guide the Department on how [Debt Settlement Ser-

---

9. Act of October 9, 2008, P.L. 1421, 63 P.S. §§ 2401–2449.

vice] Providers are to provide debt settlement services or as to what fees [Debt Settlement Service] Providers may charge." *Association of Settlement Companies,* 977 A.2d at 1270. At best, the statute instructed the Department to promulgate regulations "aimed at protecting consumers," which suffered from the same deficiency as the "public interest" standard in *Bell Telephone. Id.* at 1272. Because Section 3(b) lacked standards, we held that the debt settlement service providers had stated a claim that Section 3(b) impermissibly delegated legislative power to the Department.

More recently, in *United States Organizations for Bankruptcy Alternatives, Inc., v. Department of Banking,* 991 A.2d 370 (Pa.Cmwlth.2010), *appeal quashed,* 611 Pa. 370, 26 A.3d 474 (2011), debt settlement service providers sought summary relief in the form of a declaration that Section 3(b) of the Debt Management Services Act was unconstitutional. Relying on *Association of Settlement Companies,* this Court declared that because the statute failed to impose standards upon the Department for regulating the conduct of debt settlement service providers, Section 3(b) of the Debt Management Services Act was "unconstitutional and unenforceable." *United States Organizations for Bankruptcy Alternatives, Inc.,* 991 A.2d at 375. We declared Section 15(h) of the Debt Management Services Act likewise unconstitutional because it provided "no standards to guide or restrain the Department in setting fees for debt settlement services." *Id.*

In accordance with this precedent, the Taxicab Companies argue that, as in *Bell Telephone,* the legislature has delegated legislative power to the Parking Authority. Without "definite standards, policies and limitations," the Parking Authority may set a budget in any amount and allocate the costs of that budget among the utilities it regulates in any way it pleases. For example, the budget may be high enough to pay for an inspector to be present at all times in the front seat of every taxi regulated by the Parking Authority, and the costs for this zealous program of regulation may be allocated among affected utilities by favoritism or political party contributions. Nothing in the language in Section 5707(b) limits the discretion of the Parking Authority with respect to the establishment of its annual budget and fee schedule.

The Parking Authority responds that no standards are needed. This is because its annual budget and the annual fee schedule are established by the legislature. The Appropriations Committee of either chamber has authority to disapprove the Parking Authority's annual budget and fee schedule by moving a resolution through its respective chamber. This authority, whether exercised or not, transforms the Parking Authority's annual budget and fee schedule into a legislative act. Further, the Taxicab Companies have a remedy: they can lobby the Appropriations Committees between March 15 and April 15 each year if they want to stop a Parking Authority budget and fee schedule from becoming law.

### State Agency Budget Process

The Pennsylvania Constitution ordains the process by which any state agency's budget is prepared and enacted. This process covers all state agencies in the executive branch, whether subject to the Governor's authority or independent, and it covers all branches of Commonwealth government, including the legislature and judiciary. The process begins with a proposal prepared by the Governor that he submits to the General Assembly for enactment. Article VIII, Section 12 of the

Pennsylvania Constitution states as follows:

> Annually, at the times set by law, the Governor shall submit to the General Assembly:
>
> (a) A balanced operating budget for the ensuing fiscal year setting forth in detail (i) proposed expenditures classified by department or agency and by program and (ii) estimated revenues from all sources. If estimated revenues and available surplus are less than proposed expenditures, the Governor shall recommend specific additional sources of revenue sufficient to pay the deficiency and the estimated revenue to be derived from each source;
>
> (b) A capital budget for the ensuing fiscal year setting forth in detail proposed expenditures to be financed from the proceeds of obligations of the Commonwealth or of its agencies or authorities or from operating funds; and
>
> (c) A financial plan for not less than the next succeeding five fiscal years, which plan shall include for each such fiscal year:
>
> (i) Projected operating expenditures classified by department or agency and by program, in reasonable detail, and estimated revenues, by major categories, from existing and additional sources, and
>
> (ii) Projected expenditures for capital projects specifically itemized by purpose, and the proposed sources of financing each.

Pa. Const. art. VIII, § 12. The Pennsylvania Constitution directs the General Assembly to respond to the Governor's proposed budget. Article III, Section 11 states:

> The general appropriation bill shall embrace nothing but appropriations for the executive, legislative and judicial departments of the Commonwealth, for the public debt and for public schools. All other appropriations shall be made by separate bills, each embracing but one subject.

Pa. Const. art. III, § 11. A general or special appropriation act becomes law when signed by the Governor, who may exercise his line-item veto power over an appropriations bill. Pa. Const. art. IV, § 16.[10]

The General Assembly has enacted legislation to implement these constitutional mandates on budget making. The Administrative Code of 1929 directs the Secretary of the Budget to prepare and distribute budget request forms

> to the Governor, to the Lieutenant Governor, to the Auditor General, to the State Treasurer, to the Attorney General, to each administrative department, to each independent administrative board and commission, to the Chief Clerk of the Senate, to the Chief Clerk of the House of Representatives, to the State court administrator, and to all institutions or other agencies which desire State appropriations....

Section 610 of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. § 230.[11] Upon receipt

---

**10.** Article IV, Section 16 states:

> The Governor shall have power to disapprove of any item or items of any bill, making appropriations of money, embracing distinct items, and the part or parts of the bill approved shall be the law, and the item or items of appropriation disapproved shall be void, unless re-passed according to the rules and limitations prescribed for the passage of other bills over the Executive veto.

Pa. Const. art. IV, § 16.

**11.** Section 610, entitled "preparation of budget," was added by the Act of September 27, 1978, P.L. 775. It states, in full, as follows:

of the requests, the Secretary and the Governor may make "further inquiries and investigations" about the validity of the request. Section 610(b) of the Administrative Code of 1929, 71 P.S. § 230(b). The Governor may, or may not, approve the request. *Id.*

> (a) The Secretary of the Budget shall, in each year obtain and prepare financial and program information necessary for the preparation of a State budget for the budget year beginning July 1 and for the preparation for financial and program projections for the budget year and for four succeeding years. He shall, not later than August 15 of such year distribute to the Governor, to the Lieutenant Governor, to the Auditor General, to the State Treasurer, to the Attorney General, to each administrative department, to each independent administrative board and commission, to the Chief Clerk of the Senate, to the Chief Clerk of the House of Representatives, to the State court administrator, and to all institutions or other agencies which desire State appropriations to be made to them, the proper instructions and blanks necessary to the preparation of the budget requests with a notice that such blanks shall be returned with the information desired, not later than November 1 of the same year. Such blanks shall be in such form as shall be prescribed by the secretary, to procure any or all information pertaining to the purposes of all programs to be funded in the budget, the revenues, expenditures, program activities and accomplishments for the preceding fiscal year, for the current fiscal year, and for the budget year and for four succeeding years, the appropriations made for the preceding fiscal year, the expenditures therefrom, encumbrances thereon, the amount unencumbered and unexpended, an itemized estimate of the revenues and expenditures of the current fiscal year, for the budget year and succeeding years, and an estimate of the revenue amounts needed and program activity and accomplishment levels for the respective departments, boards, commissions, for expenses of the General Assembly, for the Judicial Department, and for any and all institutions, or other agencies to which appropriations

In *Shapp v. Sloan*, 480 Pa. 449, 391 A.2d 595 (1978), our Supreme Court established that this budget and appropriation process must be followed regardless of the source of the funds to be used by a state agency. *Shapp v. Sloan* considered a statute that required all federal grants and funds be

> are likely to be made by the General Assembly for the budget year and ensuing years. Such blanks shall also require the person returning them to accompany them with a statement in writing, giving the purposes of each program to be funded, the expected levels of activity of the programs, the expected levels of accomplishments and the measures to be used to determine to what extent the programs have achieved the stated purposes. In addition such blanks shall require the person returning them to accompany them with a statement in writing giving the facts, and an explanation of the methods and reasons for arriving at the estimates of receipts and expenditures for the budget year and for four succeeding years. It shall be the duty of each administrative department, and each independent administrative board and commission to comply, not later than November 1, with any and all requests made by the Secretary of the Budget in connection with the budget.
>
> (b) The Secretary of the Budget may, under the direction of the Governor, make further inquiries and investigations as to the financial needs, expenditures, estimates of levels of program activities and accomplishments, or revenues, of any department, board, commission, authority, political subdivision, institution or other agency receiving money from the State Treasury. The Governor may, after giving to each department, board or commission an opportunity to be heard, approve, disapprove or alter the budget requests. The Secretary of the Budget shall, on or before January 1 next succeeding, submit to the Governor, in writing, the above information, and any additional requested by the Governor, as the basis for the Governor's requests for appropriations for the next succeeding year.

71 P.S. § 230.

deposited into the State treasury for appropriation by the General Assembly. The Governor challenged the statute's constitutionality, arguing that the General Assembly lacked the power to appropriate federal funds that had been awarded to a state agency. The Governor contended that the legislature's power to appropriate was limited to those funds that had been created under state law, such as taxing laws. The Pennsylvania Supreme Court disagreed.

The Supreme Court began its analysis with a review of Section 24 of Article III of the Pennsylvania Constitution,[12] which requires legislative action before money can be paid out of the State treasury. The Court explained that all funds, even "custodial funds," belong to the Commonwealth, not its officers or its agencies. Accordingly, the Court dismissed the Governor's claim that federal grants awarded to "state executive officers and agencies" were beyond the reach of the legislature's appropriation powers. *Shapp v. Sloan*, 480 Pa. at 464, 391 A.2d at 602. The Court likewise dismissed the Governor's contention that the word "appropriation," when used in the constitutional or legislative sense, designated "money raised by taxation." *Id.* at 466, 391 A.2d at 603. It held that legislative action is required before any funds can be used by a state agency, explaining as follows:

> It is fundamental within Pennsylvania's tripartite system that the General Assembly enacts the legislation establishing those programs which the state provides for its citizens and appropriates the funds necessary for their operation. *The executive branch implements the legislation by administering the programs. It must do so within the requirements and restrictions of the relevant legislation, and within the amount appropriated by the legislature.* The executive branch may not of its own initiative use funds appropriated for one program in carrying out another and may not spend on a program more than its designated amount. It is in this way that the doctrine of separation of powers functions.

*Id.* at 468–69, 391 A.2d at 604 (emphasis added) (citation omitted). Stated otherwise, it is the "General Assembly, not the executive branch, which has been given the constitutional power to determine what programs will be adopted in our Commonwealth and how they will be financed." *Id.* at 469, 391 A.2d at 604.

*Shapp v. Sloan* established that the General Assembly, alone, is charged with "establish[ing] spending priorities and . . . [allocating] the available monies," thereby "exercis[ing] control over All expenditures." *Id.* at 470, 472, 391 A.2d at 605, 606 (emphasis in original). The General Assembly's appropriation power extends to federal grants and special funds collected by state agencies because the Pennsylvania Constitution gave this exclusive power to the General Assembly *"without regard to the source of the funds" Id.* at 465, 391 A.2d at 603 (emphasis added). In short, a state agency can only spend funds, regardless of their source, after they have been appropriated by the General Assembly.

### The Public Utility Commission's Budget

The Public Utility Commission follows the budget process established in Article

---

12. It states, as follows:
 No money shall be paid out of the treasury, except on appropriations made by law and on warrant issued by the proper officers; but cash refunds of taxes, licenses, fees and other charges paid or collected, but not legally due, may be paid, as provided by law, without appropriation from the fund into which they were paid on warrant of the proper officer.
 PA. CONST. art. III, § 24.

VIII of the Pennsylvania Constitution. Like the Parking Authority, the Commission's operations are funded not by tax revenues but by fees paid by the utilities it regulates, which are placed into a restricted account. Section 511 of the Public Utility Code, 66 Pa.C.S. § 511.[13] As the Commission's website explains:

> [T]he [Commission] may assess utilities up to three-tenths of one percent of gross intrastate revenue to cover the cost of regulation. All assessments are paid into the General Fund of the State Treasury through the Department of Revenue for use solely by the Commission. The budget for Fiscal Year 2012–13 is $60,398,000 in state funds and $4,857,000 in federal funds, for a total of $65,255,000.

> *www.puc.state.pa.us/about-puc.aspx.* As does every other state agency, the Commission submits its annual budget request to the Secretary of the Budget for the Governor's review. Section 510(a) of the Public Utility Code states, in relevant part, as follows:

> Such [budget] estimate shall be submitted to the Governor in accordance with Section 610 of the act of April 9, 1929 (P.L. 177, No. 175), known as "The Administrative Code of 1929."

66 Pa.C.S. § 510(a).[14]

The Commission's current budget, as described on its website, began as a bill

---

13. It states, in relevant part, as follows:
 (a) Payment into General Fund.—All assessments and fees received, collected or recovered under this chapter shall be paid by the [C]ommission into the General Fund of the State Treasury through the Department of Revenue.
 (b) Use and appropriation of funds.—All such assessments and fees, having been advanced by public utilities for the purpose of defraying the cost of administering this part, shall be held in trust solely for that purpose, and shall be earmarked for the use of, and annually appropriated to, the [C]ommission for disbursement solely for that purpose.
 66 Pa.C.S. § 511(a), (b).

14. It states, in full, as follows:
 (a) Determination of assessment.—Before November 1 of each year, the [C]ommission shall estimate its total expenditures in the administration of this part for the fiscal year beginning July of the following year, which estimate shall not exceed three-tenths of 1% of the total gross intrastate operating revenues of the public utilities under its jurisdiction for the preceding calendar year. Such estimate shall be submitted to the Governor in accordance with section 610 of the act of April 9, 1929 (P.L. 177, No. 175), known as "The Administrative Code of 1929." At the same time the commission submits its estimate to the Governor, the [C]ommission shall also submit that estimate to the General Assembly. The [C]ommission or its designated representatives shall be afforded an opportunity to appear before the Governor and the Senate and House Appropriations Committees regarding their estimates. The [C]ommission shall subtract from the final estimate:
 (1) The estimated fees to be collected pursuant to section 317 (relating to fees for services rendered by commission) during such fiscal year.
 (2) The estimated balance of the appropriation, specified in section 511 (relating to disposition, appropriation and disbursement of assessments and fees), to be carried over into such fiscal year from the preceding one.
 The remainder so determined, herein called the total assessment, shall be allocated to, and paid by, such public utilities in the manner prescribed. If the General Assembly fails to approve the [C]ommission's budget for the purposes of this part, by March 30, the [C]ommission shall assess public utilities on the basis of the last approved operating budget. At such time as the General Assembly approves the proposed budget the [C]ommission shall have the authority to make an adjustment in the assessments to reflect the approved budget. If, subsequent to the approval of the budget, the [C]ommission determines that a supplemental budget may be needed, the [C]ommission shall submit its request for

introduced by Senator Jake Corman on March 30, 2012, as Senate Bill 1475, Printer's No.2069. After three considerations, Senate Bill 1475 passed the Senate on May 9, 2012, and was sent to the House. After three considerations, Senate Bill 1475 passed the House on June 5, 2012. It was signed in the Senate and in the House on June 6, 2012, and presented to the Governor. On June 13, 2012, the Governor signed Senate Bill 1475, Printer's No.2069, and it became Act 4A of 2012, *i.e.,* the fourth appropriations act to be enacted in 2012.

In short, the Commission's budget was established under the budgeting process that is mandated for all state agencies.

### The Philadelphia Parking Authority's Budget

■ The Parking Authority is a state agency for purposes of regulating taxicabs and limousines. *Blount v. Philadelphia Parking Authority,* 600 Pa. 277, 289, 965 A.2d 226, 234 (2009); 53 Pa.C.S. § 5505(a)(1) (stating that a parking authority "shall constitute a public body corporate and politic, exercising public powers of the Commonwealth as an agency of the Commonwealth."). Like the Public Utility Commission, the Philadelphia Parking Authority's operations are funded by the fees assessed upon the utilities it regulates. However, the Parking Authority does not submit an annual budget request to the Secretary of the Budget; its budget request is not reviewed or approved by the Governor; and its budget request is not introduced in the legislature as a bill subject to multiple considerations in each chamber before a vote. Instead, the Board of the Parking Authority sends a

that supplemental budget simultaneously to the Governor and the chairmen of the House and Senate Appropriations Committees.

"budget ... for the coming fiscal year" to the Appropriations Committees of the House and the Senate. 53 Pa.C.S. § 5707(b). If the committees do not exercise a veto over the Parking Authority's budget, it becomes "law," as the Parking Authority puts it. This manner of establishing a state agency's budget is *sui generis.* Unlike any other state agency, the Parking Authority sets its annual budget, which changes from year to year, without the oversight of either the Governor or the General Assembly as a body.

To be sure, the legislature has bowed to some of the precepts of *Shapp v. Sloan* with respect to the Parking Authority. The legislature has recognized that the fees paid by taxicabs and limousines belong not to the Parking Authority, but to the Commonwealth. As such, those monies are placed into a special fund and are subject to appropriation by the General Assembly. Section 5707(c) of the Parking Authority Law provides for an appropriation of these monies. It states:

> (c) Philadelphia Taxicab and Limousine Regulatory Fund.
>
> —*Money deposited in the Philadelphia Taxicab and Limousine Regulatory Fund is hereby specifically appropriated* for the purposes of this chapter and shall not be used for any purpose not specified in this chapter. All interest earned by the fund and all refunds or repayments shall be credited to the fund.

53 Pa.C.S. § 5707(c) (emphasis added). The Philadelphia Taxicab and Limousine Regulatory Fund consists of three accounts:

(1) Taxicab Account.

(2) Limousine Account.

66 Pa.C.S. § 510(a).

(3) Other accounts as determined by the authority.

53 Pa.C.S. § 5708(a)(1)-(3). The funds may not be commingled. However, expenses incurred for regulation where the share cannot be determined

> shall be divided in a fair and equitable manner between the Taxicab Account and the Limousine Account *as determined by the authority,* and the authority may adjust this measure from time to time.

53 Pa.C.S. § 5708(c)(2) (emphasis added). Finally, the Parking Authority "*at its discretion,* may allocate expenses and revenues to the appropriate accounts." 53 Pa.C.S. § 5708(f) (emphasis added).

■ Continuing appropriations are valid. *Stilp v. Commonwealth,* 601 Pa. 429, 974 A.2d 491 (2009). An example of a continuing appropriation is found in Section 306 of the Tobacco Settlement Act, Act of July 26, 2001, P.L. 755, 35 P.S. § 5701.306.[15] *See Sears v. Corbett,* 49 A.3d 463 (Pa.Cmwlth.2012). Section 306 specifies, by percentage amounts, how the settlement funds that are paid into the Tobacco Settlement Fund each year will be spent, leaving the fund no discretion on their expenditure.

By contrast, the continuing appropriation in Section 5708 of the Parking Authority Law gives the Parking Authority the power to allocate expenses and revenues between the Taxicab and Limousine Accounts and even to set up other accounts. This is quite unlike the very specific allocations and expenditures in the continuing appropriation effected by Section 306 of the Tobacco Settlement Act. Further, there is no limit on the amount the Parking Authority can spend on its operations,

---

**15.** It states:

(a) Annual report.—The Governor shall report on the fund in the annual budget which shall include the amounts appropriated to each program.

(b) Appropriations.—

(1) *The General Assembly hereby appropriates funds in the fund in accordance with the following percentages based on actual funds received in each year or upon receipt of the final annual payment:*

(i) Eight percent for deposit into the Health Account pursuant to this chapter, which shall be deposited immediately upon receipt.

(ii) Thirteen percent for home and community-based services pursuant to Chapter 5. For fiscal year 2001–2002, up to $13.5 million may be used for expanded counseling, area agency on aging training and education, assistive technology and for reducing waiting lists for services in the Department of Aging.

(iii) Twelve percent for tobacco use prevention and cessation programs pursuant to Chapter 7.

(iv) Eighteen percent for health and related research pursuant to section 906 and one percent for health and related research pursuant to section 909.

(v) Ten percent for the uncompensated care payment program pursuant to Chapter 11.

(vi) Thirty percent for health investment insurance pursuant to Chapter 13 and for the purchase of Medicaid benefits for workers with disabilities pursuant to Chapter 15.

(vii) Eight percent for the expansion of the PACENET program pursuant to Chapter 23.

(2) In addition, any Federal funds received for any of these programs is hereby specifically appropriated to those programs.

(c) Lapses.—Lapses shall be deposited in the Health Account except for the following:

(1) Lapses from monies provided for the home and community-based care services shall be reallocated to the home and community-based care program for use in succeeding years.

(2) Lapses from moneys provided for the health investment insurance program shall be reallocated to the health investment insurance program for use in succeeding years.

35 P.S. § 5701.306 (emphasis added).

as there is for the Public Utility Commission. *See* 66 Pa.C.S. § 510(a) (Commission's total annual budget may not exceed "three-tenths of 1% of the total gross intrastate operating revenues" of utilities in the prior calendar year).

### Philadelphia Parking Authority Fee Schedule

Section 5707(b) imposes no limits upon the establishment of the Parking Authority's fee schedule. The aggregate amount of fees to be paid by the utilities that report to the Parking Authority is a matter committed totally to the Parking Authority's discretion. How the fees are allocated among regulated taxicabs and limousines is likewise discretionary with the Parking Authority.

Again, it is useful to compare the scheme in Section 5707(b) to the way the annual fee schedule of the Public Utility Commission is established. Section 510(b) of the Public Utility Code imposes standards for the apportionment of the Commission's budget among the various public utilities. The allocation is done by calculating the costs "attributable to the regulation of each group of utilities furnishing the same kind of service." 66 Pa.C.S. § 510(b)(1)-(3).[16] Each utility in a group is assessed according to the proportion of that utility's revenue compared to the total revenue of its utility group. Section 510(b)(4) states:

> Each public utility within a group shall then be assessed for and shall pay to the commission such proportion of the amount allocated to its group as the gross intrastate operating revenues of the public utility for the preceding calendar year bear to the total gross intrastate operating revenues of its group for that year.

66 Pa.C.S. § 510(b)(4). In sum, a utility's assessment by the Commission is determined by a legislative standard, *i.e.*, the utility's relative revenue and profitability.

### Constitutionality of Section 5707 of the Parking Authority Law

■ The Taxicab Companies argue that Section 5707(b) of the Parking Authority Law is facially unconstitutional because it is devoid of any guidance, standards for or restrictions upon the Philadelphia Parking Authority's power to formulate its annual budget and annual fee schedule. The Parking Authority is free to spend, without any limit, whatever amount it believes "necessary to advance the purposes of this chapter," *i.e.*, the regulation of taxicabs and limousines in Philadelphia. 53 Pa.C.S. § 5707(b). *Cf.* Section 510(a) of the Public Utility Code, 66 Pa.C.S. § 510(a). Nothing in Section 5707(b) limits the Parking Authority's exercise of discretion in allo-

---

16. Section 510(b)(1)-(3) states as follows:

(1) The commission shall determine for the preceding calendar year the amount of its expenditures directly attributable to the regulation of each group of utilities furnishing the same kind of service, and debit the amount so determined to each group. The commission may, for purposes of the assessment, deem utilities rendering water, sewer or water and sewer service, as defined in the definition of "public utility" in section 102 (relating to definitions), as a utility group.

(2) The commission shall also determine for the preceding calendar year the balance of its expenditures, not debited as aforesaid, and allocate such balance to each group in the proportion which the gross intrastate operating revenues of such group for that year bear to the gross intrastate operating revenues of all groups for that year.

(3) The commission shall then allocate the total assessment prescribed by subsection (a) to each group in the proportion which the sum of the debits made to it bears to the sum of the debits made to all groups.

66 Pa.C.S. § 510(b)(1)-(3).

cating the costs of regulation among the various types of motor carriers that it regulates. *Cf.* Section 510(a), (b) of the Public Utility Code, 66 Pa.C.S. § 510(a), (b). The contrasts between Chapter 57 of the Parking Authority Law and Section 510 of the Public Utility Code, both of which create a state agency to regulate public utilities, demonstrate the constitutional infirmity of Section 5707(b).

Section 5707(b) states that the Parking Authority's annual budget and fee schedule shall be in the amounts "necessary to advance the purposes of this chapter." General expenses that cannot be tied to either the Limousine Account or the Taxicab Account will be allocated in "a fair and equitable manner ... as determined by the authority." 53 Pa.C.S. § 5708(c)(2). The words "necessary" and "fair and equitable" suggest a standard, but it is a standard too inchoate to survive the separation of powers challenge brought by the Taxicab Companies.

First, the words "necessary to advance the purposes of this chapter" impose no limit, unless one believes that in their absence the Parking Authority would adopt a budget to advance the purposes of another chapter or to set up a string of adult bookstores. It is no more instructive or limiting than the "public interest" standard that was rejected by our Supreme Court in *Bell Telephone.* Rather than express a limit, "necessary to advance the purposes of this chapter" expresses a broad grant of authority to the Parking Authority. It is for the legislature to decide what is "necessary," just as it is for the legislature to decide what is in the public interest.

Second, the amount that a state agency should spend on itself does not lend itself to easily identifiable standards. This is why our Constitution provides for an elaborate budgeting process that requires "inquiries and investigations" by the Gov-

ernor before a budget request is even submitted to the legislature for its review. Section 610(b) of the Administrative Code of 1929, 71 P.S. § 230(b). The Public Utility Commission goes through this process even though its annual budget is capped by a fixed percentage of the annual intrastate revenues of the utilities it regulates.

Third, the requirement in Section 5708 that the Parking Authority allocate certain non-assignable costs to the Limousine and Taxicab Accounts in a "fair and equitable" manner does not solve the constitutional problem in Section 5707. "Fair and equitable" is a standard that is no more precise than "public interest." In any case, this standard applies only to the Parking Authority's assignment of costs to one of the accounts in the Philadelphia Taxicab and Limousine Regulatory Fund. Strangely enough, the legislature did not impose this requirement on the Parking Authority when drawing up its fee schedule. Stated otherwise, the Parking Authority is not required to be "fair and equitable" when exercising its authority under Section 5707(b) to allocate the costs of its annual budget among the utilities it regulates. The Parking Authority's fee schedule is driven by what the Parking Authority determines its annual budget should be, and the costs of funding that budget are apportioned among utilities in any way whatsoever, whether fair or unfair.

■ Separation of powers mandates that "the executive, legislative, and judicial branches of government are equal and none should exercise powers exclusively committed to another branch." *Seitzinger v. Commonwealth,* 25 A.3d 1299, 1305 (Pa. Cmwlth.2011) (quoting *Jefferson County Court Appointed Employees Association v. Pennsylvania Labor Relations Board,* 603 Pa. 482, 491, 985 A.2d 697, 703 (2009)). The objective of the doctrine "is basic and

vital ... namely, to preclude a commingling of these essentially different powers of government in the same hands." *Seitzinger*, 25 A.3d at 1305 (quoting *O'Donoghue v. United States*, 289 U.S. 516, 530, 53 S.Ct. 740, 77 L.Ed. 1356 (1933)). The power invested in the Appropriations Committees by Section 5707(b) to stop the Parking Authority's annual budget or fee schedule is inadequate to satisfy the Pennsylvania Constitution's demand that the powers of each branch not be commingled. First, laws begin as bills that receive multiple considerations before they are brought to a vote before both chambers. They are not made by legislative committees. Second, the power given to the Appropriations Committees in Section 5707(b) is a veto power, which is not a legislative power.[17] The veto is an executive power that belongs solely to the Governor.

We hold that Section 5707(b) is unconstitutional. The General Assembly has failed to establish standards directing the Parking Authority's exercise of discretion in deciding how much to spend each year to regulate common carriers providing taxicab and limousine service in Philadelphia.[18]

Additionally, the General Assembly has given the Parking Authority "no standards to guide or restrain [it] in setting fees" in any fashion whatsoever. *United States Organizations for Bankruptcy Alternatives, Inc.*, 991 A.2d at 375. Because Section 5707(b) lacks standards to guide the establishment of an annual budget and fee schedule, it delegates legislative power to the Parking Authority, in violation of separation of powers.

## Due Process Deprivation

 The Parking Authority agrees with the Taxicab Companies that once its annual fee schedule makes it past the Appropriations Committees without objection, it is beyond challenge in either an administrative or judicial hearing. It argues that because its fee schedule bears the imprimatur of the legislature, it is not an adjudication that can be set aside in a hearing.[19] Thus, under Section 5707(b), the Taxicab Companies' sole remedy is to lobby the Appropriations Committees between March 15 and April 15 of each year. The Taxicab Companies contend that Section

---

**17.** In *Commonwealth v. Sessoms*, 516 Pa. 365, 532 A.2d 775 (1987), the Pennsylvania Supreme Court discussed and applied United States Supreme Court precedent requiring separation of powers. The legislative branch makes laws, and the executive branch has the power to veto those laws. Our Supreme Court explained that once the legislature makes a law to be carried out by an administrative agency, the legislature cannot attempt, either "directly or indirectly, to retain some power over the execution of the laws." *Id.* at 375, 532 A.2d at 780. Rather,

> once [the legislature] makes its choice enacting legislation, its participation ends. [It] can thereafter control *the execution* of its enactment only indirectly-by passing new legislation.

*Id.* at 374, 532 A.2d at 779–80 (emphasis in original) (quoting *Bowsher v. Synar*, 478 U.S. 714, 733–34, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986)).

In short, the General Assembly cannot exercise a legislative veto over an administrative agency's budget. The power of the veto belongs only to the executive. Pa. Const. art. IV, § 15. As noted, the Governor enjoys a line-item veto with respect to an appropriations bill. Pa. Const. art. IV, § 16.

**18.** The issue of whether adding standards to Section 5707(b) would effect a constitutional process for setting a state agency's annual budget is not before the Court.

**19.** If a taxicab company receives an annual invoice that does not conform to the annual fee schedule, by mistake or otherwise, that company may obtain a corrected invoice by means of an administrative hearing, in the event the Parking Authority declines to issue a corrected invoice. In other words, the "hearing" right is limited in scope to the correction of a ministerial error.

5707(b) unconstitutionally deprives them of due process because it does not provide any procedure for challenging the Parking Authority's fee schedule, either before or after its adoption. We agree.

The Fourteenth Amendment to the United States Constitution and Article I, Section 1 of the Pennsylvania Constitution guarantee due process of law before the state can deprive an individual of a protected life, liberty or property interest. *Pennsylvania Game Commission v. Marich,* 542 Pa. 226, 229–30, 666 A.2d 253, 255 (1995). The right to pursue a livelihood or profession is a protected property interest that triggers procedural due process. *Khan v. State Board of Auctioneer Examiners,* 577 Pa. 166, 181, 842 A.2d 936, 945 (2004). As our Supreme Court has explained, the "Constitution guarantees to those who invest their property in business enterprises that it will not be taken without due process of law." *National Automobile Service Corporation v. Barfod,* 289 Pa. 307, 313, 137 A. 601, 603 (1927). The "essential elements [of due process] are notice and opportunity to be heard and to defend in an orderly proceeding adapted to the nature of the case before a tribunal having jurisdiction of the cause." *Conestoga National Bank of Lancaster v. Patterson,* 442 Pa. 289, 295, 275 A.2d 6, 9 (1971) (internal quotation omitted) (quoting *Wiley v. Woods,* 393 Pa. 341, 351, 141 A.2d 844, 849–50 (1958)).

*National Automobile* is on point. At issue in that case was a statute that charged the Insurance Commissioner with the responsibility to regulate companies that issued contracts guaranteeing services to automobile owners, such as towing, repairs and legal services.[20] National Automobile, a company whose business was covered by the statute, challenged the statute's constitutionality because it authorized the Insurance Commissioner to terminate its business if it did not increase its net worth in 10 days or less, but it made no provision for "notice and hearing." *National Automobile,* 289 Pa. at 310, 137 A. at 602. Our Supreme Court agreed that this lack of a hearing deprived National Automobile of due process.

The Court began with the observation that it is a "fixed principle in our law that no man shall be adjudged in person or property without notice and an opportunity to appear and be heard. To condemn without a hearing is repugnant to due process." *Id.* at 311, 137 A. at 602. Because due process applies to administrative officials, "there must be a hearing somewhere, at some stage in the proceeding, even if it be after the property itself is parted with," in order for the agency's action to comport with due process. *Id.* In *National Automobile,* the statute did not provide for a hearing either before or after the company was put out of business by the Commissioner. The Supreme Court summarized the due process defects in the statute as follows:

> Section 10 reposes an autocratic power in the insurance commissioner. He may not only investigate, but he may also determine whether liquidation or closing shall take place. He may seize the property of the corporation, wind up its business, and distribute the assets, without accounting to anyone. No rule or standard is established to limit his powers or to determine when a liquidation shall be enforced.

*Id.*[21]

*National Automobile* was decided before the enactment of the Administrative

---

**20.** The companies were not insurance companies; they offered pre-paid service contracts.

**21.** The Taxicab Companies face a loss of their certificates of public convenience, impound-

Agency Law, 2 Pa.C.S. §§ 101–754. Where a statute does not provide for a hearing from the agency responsible for the statute's enforcement, the Administrative Agency Law provides one. It is the "default" mechanism by which a person aggrieved by an agency's action can be heard. *In Re: Petition for Formation of Independent School District,* 17 A.3d 977, 983 n. 9 (Pa.Cmwlth.2011). It is not the mere absence of a hearing remedy in Section 5707(b) that renders it unconstitutional. Rather, it is the bar to any relief erected by Section 5707(b) that effects the due process violation.

First, Section 5707(b) mandates that the Parking Authority's annual fee schedule reside with the Appropriations Committees between March 15 and April 15. There is no other way or timetable for implementing or modifying an annual fee schedule. This legislative review effects not just a bottleneck but a dead end to a hearing. Once the Appropriations Committees have acted, or not acted, the Parking Authority may not further act. It lacks the power to hold a hearing and adjudicate a correction to its own fee schedule, were it convinced after a hearing that it should do so. No order to change a fee schedule can be effected without approval of the Appropriations Committees, and they act only between March 15 and April 15. Further, the Parking Authority cannot order the Appropriations Committees to change a fee schedule or, for that matter, to do anything. The Administrative Agency Law does not apply to legislative bodies of any type; thus, these committees cannot be compelled to hold due process hearings to consider a challenge to a Parking Authority annual fee schedule.

Second, even if there were a way, somehow, to have a hearing on an annual fee schedule before some adjudicating body, the hearing would be short. Because Section 5707(b) lacks any standards for an annual fee schedule, error by the Parking Authority or by the Appropriations Committees would be difficult to demonstrate.[22] The absence of standards for a fee schedule does more than violate separation of powers; it also deprives the affected utilities of due process. As in *National Automobile,* the lack of necessary standards is inextricably entwined with the lack of due process.

In *National Automobile,* the Supreme Court referred to "other statutes" involving "powers of a like character" and observed that in these other statutes, the agency's powers were limited by notice, hearing and adjudication. *National Automobile,* 289 Pa. at 313, 137 A. at 603. That comparison is also useful here. The other state agency that has the power to impose fees upon the public utilities it regulates is the Public Utility Commission. The Commission is limited with respect to the powers it can exercise to establish the fee schedule imposed on the utilities it regulates.

Section 510(c) of the Public Utility Code gives each public utility the opportunity to challenge its assessment. It states:

ment of their vehicles or civil penalties if they do not pay the 2012–2013 fees invoiced by the Parking Authority. Petition for Review ¶ 41. These sanctions may not be as extreme as the liquidation at issue in *National Automobile,* but they impair property rights to a substantial degree and, thus, implicate due process.

22. The Parking Authority agrees, in fact insists, that the Administrative Agency Law does not provide the Taxicab Companies an avenue for challenging the Parking Authority's annual fee schedule. The Parking Authority argues that its fee schedule is not an adjudicatory action because it became operative by decision of the Appropriations Committees and, thus, is beyond challenge.

(c) Notice, hearing and payment.—The [C]ommission shall give notice by registered or certified mail to each public utility of the amount lawfully charged against it under the provisions of this section, which amount shall be paid by the public utility within 30 days of receipt of such notice, unless the [C]ommission specifies on the notices sent to all public utilities an installment plan of payment, in which case each public utility shall pay each installment on or before the date specified therefor by the [C]ommission. *Within 15 days after receipt of such notice, the public utility against which such assessment has been made may file with the [C]ommission objections setting out in detail the grounds upon which the objector regards such assessment to be excessive, erroneous, unlawful or invalid.* The [C]ommission, after notice to the objector, shall hold a hearing upon such objections. After such hearing, the [C]ommission shall record upon its minutes its findings on the objections and shall transmit to the objector, by registered or certified mail, notice of the amount, if any, charged against it in accordance with such findings, which amount or any installment thereof then due, shall be paid by the objector within ten days after receipt of notice of the findings of the [C]ommission with respect to such objections. If any payment prescribed by this subsection is not made as aforesaid, the [C]ommission may suspend or revoke certificates of public convenience, certify automobile registrations to the Department of Transportation for suspension or revocation or, through the Department of Justice, may institute an appropriate action at law for the amount lawfully assessed, together with any additional cost incurred by the [C]ommission or the Department of Justice by virtue of such failure to pay.

66 Pa.C.S. § 510(c) (emphasis added). To challenge the assessment, the utility must pay under protest and then seek reimbursement. 66 Pa.C.S. § 510(c), (d).[23] This comparison demonstrates the problem with Section 5707.

**23.** It states:
Suits by public utilities—No suit or proceeding shall be maintained in any court for the purpose of restraining or in anywise delaying the collection or payment of any assessment made under subsections (a), (b) and (c), but every public utility against which an assessment is made shall pay the same as provided in subsection (c). *Any public utility making any such payment may, at any time within two years from the date of payment, sue the Commonwealth in an action at law to recover the amount paid, or any part thereof, upon the ground that the assessment was excessive, erroneous, unlawful, or invalid, in whole or in part, provided objections, as hereinbefore provided, were filed with the [C]ommission, and payment of the assessment was made under protest either as to all or part thereof.* In any action for recovery of any payments made under this section, the claimant shall be entitled to raise every relevant issue of law, but the findings of fact made by the [C]ommission, pursuant to this section, shall be prima facie evidence of the facts therein stated. Any records, books, data, documents, and memoranda relating to the expenses of the [C]ommission shall be admissible in evidence in any court and shall be prima facie evidence of the truth of their contents. If it is finally determined in any such action that all or any part of the assessment for which payment was made under protest was excessive, erroneous, unlawful, or invalid, the [C]ommission shall make a refund to the claimant out of the appropriation specified in section 511 as directed by the court. 66 Pa.C.S. § 510(d) (emphasis added).

*Pennsylvania Coal Mining Association v. Insurance Department,* 471 Pa. 437, 370 A.2d 685 (1977), is also instructive. That case concerned the workers' compensation insurance that coal mine operators were required to purchase on behalf of their workers, who were exposed to black lung disease. Our Supreme Court held that the coal mine operators had a constitutionally protected due process interest in the cost of that insurance. This was because the companies were required to purchase the insurance; the insurance rates constituted a significant portion of their payroll costs; and if required to pay excessive insurance rates, they would be less competitive.[24] The statute provided the coal mine operators a hearing only *after* the insurance rates became effective. This guaranteed, after-the-fact hearing was held to be inadequate because the coal mine operators were "best protected against arbitrary action when [they were] given an opportunity to challenge that action *before* it is taken." *Id.* at 451, 370 A.2d at 692 (emphasis added). Our Supreme Court held that the coal mine operators were entitled to notice of a rate filing, so that they could participate in the Insurance Department's review before it became effective and binding on them. *Cf. Allegheny Ludlum Steel Corporation v. Pennsylvania Public Utility Commission,* 67 Pa.Cmwlth. 400, 447 A.2d 675 (1982) (holding that the Public Utility Code's provision, which allowed a utility to adjust its rates automatically to reflect its increased fuel costs without advance notice to customers, did not offend due process because the customer could recover any amounts, with interest, charged by the utility in excess of the utility's actual fuel costs in an after-the-fact hearing).

Section 5707(b) requires the Taxicab Companies to pay a fee to the Parking Authority if they wish to stay in business. The fee can be excessive and confiscatory, but there is no relief to the utilities subject to such a fee. The Taxicab Companies cannot challenge the fee schedule in a hearing "at any stage in the process," either before or after the fee schedule becomes effective. *National Automobile,* 289 Pa. at 311, 137 A. at 602. To "condemn without a hearing is repugnant to the due process clause." *Id.* Accordingly, we hold that Section 5707(b) is unconstitutional.

### Conclusion

The General Assembly has chosen to divide the regulation of public utilities between the Pennsylvania Public Utility Commission and the Philadelphia Parking Authority. The wisdom of this bifurcation is beyond this Court's purview, but it must be done in accordance with the constitutions of the United States and the Commonwealth of Pennsylvania. Section 5707(b) of the Parking Authority Law delegates legislative power to the Parking Authority, which offends the separation of powers required by our Pennsylvania Constitution. Because Section 5707(b) confers autocratic power upon the Philadelphia Parking Authority to condemn property without due process, it offends the due process provisions of the Pennsylvania and United States Constitutions.[25] According-

---

**24.** The statute regulating insurance rates contained standards, *i.e.,* that the rates not be "inadequate or [discriminate] unfairly between risks if essentially the same hazard." Section 654(d) of the Insurance Company Law of 1971, Act of May 17, 1921, P.L. 682, *as amended,* 40 P.S. § 814(d). The statute is "designed to prevent excessive rates, [and] the procedure for setting rates adds to the dependency of the Association on the Insurance Department." *Pennsylvania Coal Mining Association,* 471 Pa. at 448, 370 A.2d at 690–91.

**25.** We deny the Taxicab Companies summary relief on their claim that Section 5707(b) is not severable from the remainder of Chapter

ly, summary relief will be granted to the Taxicab Companies, and the preliminary objections of the Philadelphia Parking Authority will be overruled.[26]

### ORDER

AND NOW, this 14th day of February, 2013, the preliminary objections filed by the Philadelphia Parking Authority are hereby OVERRULED and the motion for summary relief filed by Petitioners MCT Transportation Inc. t/a Montco Suburban Taxi, *et al.*, in the above captioned matter is hereby GRANTED IN PART and DENIED IN PART. Section 5707(b) of the act commonly referred to as the Parking Authority Law, 53 Pa.C.S. § 5707(b), is hereby declared unconstitutional and unen-

forceable, and the Philadelphia Parking Authority is hereby enjoined from taking any action with regard to Petitioners under authority of Section 5707(b). The remainder of the Petitioners' motion is DENIED.

Judge LEADBETTER concurs in the result and joins on the issue of unconstitutional delegation, but dissents as to the due process discussion.

---

57 and, thus, Act 94 is entirely unconstitutional. There is no requirement that the General Assembly provide funding to any agency charged with the responsibility of enforcing a statute. In any given year the legislature may decide not to fund a program. That does not mean the statute setting up a program is unconstitutional.

**26.** We do not address the preliminary objections of the Parking Authority relating to pleading sufficiency because they are, as the Parking Authority acknowledged, amendable defects. At oral argument, the Parking Authority requested the Court to rule on the substantive issues.